JOEL KLIGMAN AND MARCIA KLIGMAN, PLAINTIFFS-AP-
PELLANTS, v. SOLOMON LAUTMAN, DANIEL S. KRU-
MAN AND RALPH W. CAMPBELL, CONSTITUTING THE
BOARD OF COMMISSIONERS OF THE BOROUGH OF
DEAL, NEW JERSEY, W. STANLEY CONOVER,
BOROUGH CLERK, WILLIAM D. AYRES, ACTING
BOROUGH ENGINEER, AND LEON S. AVAKIAN, BUILD-
ING INSPECTOR, DEFENDANTS-RESPONDENTS.

Argued September 9 and 10, 1968—Decided March 31, 1969.

518

522

*Mr. Jerome S. Lieb* argued the cause for plaintiffs-appellants (*Messrs. Lieb and Teich,* attorneys; *Mr. Lieb,* of counsel).

*Mr. Henry J. Saling* argued the cause for defendants-respondents (*Messrs. Saling, Boglioli & Moore,* attorneys; *Mr. Saling,* of counsel; *Mr. John W. O'Mara,* on the brief).

The opinion of the court was delivered by

HALL, J. Plaintiffs are the owners of a tract of land in the Borough of Deal, Monmouth County, which they desire to subdivide into residential building lots. The tract is so situated that a new road or way through it is required in order to furnish access to proposed interior lots from an existing public street. Plaintiffs' aim has been to obtain assurance that building permits would be issued for the lots; and they have pursued this by a melange of varying positions and actions.

 Deal has never implemented the Municipal Planning Act (1953), *N. J. S. A.* 40:55–1.1 to 1.29, inclusive, and therefore has no planning board, master plan or subdivision regulation ordinance. Nor has it adopted an official map as authorized by the Official Map and Building Permit Act (1953), *N. J. S. A.* 40:55–1.30 to 1.42, inclusive. However, the borough does have certain ordinance provisions bearing on subdivision control which were applied at the municipal

level to deny plaintiffs any favorable action. The Law Division, following an intermediate trip to the Appellate Division, 91 *N. J. Super.* 488 (*App. Div.* 1966), upheld the municipality. The judgment was affirmed, 98 *N. J. Super.* 344 (*App. Div.* 1967), and plaintiffs now appeal to this court claiming that certain of the ordinance provisions are unconstitutional. R. R. 1:2–1(a). Additionally they contend that the municipality lacked power to enact them and, alternatively, that they are inapplicable in the present factual situation — non-constitutional claims which we will also consider where, as here, there is a proper basis for an appeal as of right. See *Klotz v. Lee,* 21 *N. J.* 148, 155–156 (1956); cf. *Frank v. Frank,* 7 *N. J.* 225, 234–235 (1951); *Sorokach v. Trusewich,* 13 *N. J.* 363, 367–368 (1953); *Fortugno Realty Co. v. Schiavone-Bonomo Corp.,* 39 *N. J.* 382, 386–388 (1963).

Running through the case is the fundamental question of the extent of municipal power to control land subdivision and development where the municipality has not seen fit to utilize the permissive provisions of the Planning Act. The subject has rarely come before our courts, although its importance is indicated by the fact that, surprisingly, as of January, 1965, 117 of the state's 568 municipalities have not adopted land subdivision regulation ordinances, according to the Municipal Planning Controls Survey made by the State Department of Conservation and Economic Development. About 20 of these are rural townships presumably not yet faced with development problems. Many of the remaining number, of which Deal is one, however, are not so fully developed as no longer to be concerned about land subdivision.

Deal is a high-class residential community bordering the Atlantic Ocean for about a mile and a half just south of the city of Long Branch. It has long been a place for summer mansions as well as substantial year-round residences. Its zoning ordinance permits no industry, and local business districts are few and small in size.

Ocean Avenue, a through highway connecting a number of ocean-front municipalities and heavily traveled, especially in the summer season, runs north and south through the borough, about 900 feet west of the high water line of the ocean. The entire area between the avenue and the ocean, as well as the land on the westerly side of the street to a depth of 200 feet, always has been zoned one-family residential, with only one dwelling per lot permitted regardless of the size of the lot. It is the highest grade residential district in the municipality, requiring a minimum lot frontage of 150 feet and a minimum depth of 125 feet. This district originally was largely occupied by palatial summer homes. The lots on the ocean side were extensive in frontage and ran in depth from the avenue to the high water line.

In late years, most of these ocean-front mansions have been torn down or otherwise destroyed. Many of the plots they occupied have been subdivided into smaller lots, upon which smaller houses have been erected, fronting on some 17 streets running easterly from Ocean Avenue, several of which are quite new. These streets terminate in cul-de sacs, or dead-end at the beach, except at the southerly end of the borough where a street parallel to Ocean Avenue connects four of them. While the record does not disclose the procedures and circumstances under which these subdivisions took place or under which the streets were constructed and opened, there is no suggestion that they were not approved in some fashion by the municipality or that the new streets are not public roads duly accepted and maintained by the borough.

In 1964 plaintiffs acquired one of the remaining large plots, comprising about six acres. It is relatively narrow, having a frontage of only 300 feet on Ocean Avenue, although it runs over 900 feet to the beach. The north boundary of the plot lies 150 feet south of the side line of Wallace Road, one of the new streets previously noted running east from Ocean Avenue toward the shore; and the south boundary lies approximately the same distance north of the side line of Clem Conover Road, another such street. Under the zoning ordi-

nance the tract comprises a single lot unless subdivided. By reason of the 150 foot frontage requirement, subdivision would be limited to two lots fronting on Ocean Avenue, each with depth to the ocean, unless a street or way is run easterly from the avenue through the tract, in which event three or more interior lots of acceptable size, depending upon the arrangement, could be laid out fronting on such a means of access. This is what plaintiffs have sought to accomplish.

The borough had two ordinances affecting such a subdivision when plaintiffs purchased the property. The first, adopted in 1953, "regulat[es] the dedication [*sic*] and acceptance of roads, avenues, streets and highways" ("the street ordinance") and provides in effect that no dedicated street shall be accepted by the governing body unless certain conditions have been complied with and compliance certified by the borough engineer. These conditions include approved grading, proper surface drainage, a width of 36 feet between curbs, paving with six inches of compact road gravel (upgraded by a 1967 amendment to additionally require two inch thick bituminous concrete pavement), construction of concrete curbs and sidewalks, installation of sanitary sewer lines with laterals and connections to abutting lots, and any additional requirements which the borough might see fit to impose.

The second pertinent provision was a zoning ordinance amendment enacted in 1956, designated as section 12A. This, which plaintiffs ultimately challenged, provides:

"Section 12A. No building or structure of any kind, type or description whatsoever shall be erected, converted or occupied in the Borough of Deal unless such building or structure is situate on a lot or plot which fronts on a public street, avenue or highway that has been duly dedicated to, and formally accepted by, the Borough of Deal."

The effect is that no building permit can issue unless the proposed structure fronts on an accepted (public) street, which, if a new street, by reason of the street ordinance re-

quirements just referred to, would have had to have been previously constructed in full compliance therewith by and at the expense of the landowner. It should be noted that section 12A, by requiring frontage on an accepted street, seems to go beyond the requirements of *N. J. S. A.* 40:55–1.39, contained in the Official Map and Building Permit Act (1953), which reads as follows:

"No permit for the erection of any building shall be issued unless the building lot abuts a street giving access to such proposed structure which has been duly placed on the official map; or, if there be no official map, unless such street is (a) an existing State, county or municipal street or highway, or (b) a street shown upon a plat approved by the governing body or planning board as provided in the Municipal Planning Act (1953), or in any act repealed thereby, or (c) a street on a plat duly filed in the office of the county recording officer prior to the passage of an ordinance under the Municipal Planning Act (1953) or any act repealed thereby which required prior approval of plats by the governing body or other authorized body. Before any such permit shall be issued, such street shall have been certified to be suitably improved to the satisfaction of the governing body, or such suitable improvement shall have been assured by means of a performance guarantee, in accordance with standards and specifications approved by the governing body, as adequate in respect to the public health, safety and general welfare for the special circumstances of the particular street."

Considering the street ordinance and section 12A together, the practical result is a scheme of municipal subdivision control pursued without implementation of the Planning Act. This scheme requires a landowner who, for building purposes, desires to subdivide a tract necessitating a new means of access to install at his own expense improvements akin to those which can be imposed through the procedures specified in the Planning Act (see *N. J. S. A.* 40:55–1.20 and 1.21), and thereafter to secure municipal acceptance of the new street. We will return later to the matter of whether a municipality which has not implemented the Planning Act has power to require the installation of such improvements and, further, whether section 1.39 of the Official Map and Building Permit Act applies therein.

The first step plaintiffs took toward accomplishing their aim was to submit a subdivision map of the tract to the municipal governing body for approval under the 1960 map filing law. *N. J. S. A.* 46:23–9.9 *et seq.* That statute, successor to earlier enactments of similar import (*N. J. S. A.* 46:23–1 to 11, inclusive, and *N. J. S. A.* 46:23–9.6 to 9.8, inclusive), and clearly applicable to municipalities which have not implemented the Planning Act, prescribes technical and other requirements that must be met before a map can be approved by the proper authority (here the governing body). Such approval is a prerequisite to the filing of it with the county recording officer. Among these requirements are certifications by municipal officials that the map conforms with all municipal ordinances, and that the streets, avenues, roads, lanes or alleys shown thereon have been "approved" by the governing body. *N. J. S. A.* 46:23–9.11(n) and (p). In this connection, note that the act provides that municipal approval of the map shall not be construed as acceptance of any road, street or highway shown thereon or as obligating the municipality to maintain or exercise jurisdiction over it. *N. J. S. A.* 46:23–9.13.

The act is entirely permissive in the sense that there is no requirement that a subdivision plat must be approved and filed before any land forming a part of the subdivision may be conveyed even where new streets are shown, in a municipality which has not adopted a subdivision ordinance pursuant to the Planning Act. (The contrary is true where the municipality has enacted such an ordinance, see *N. J. S. A.* 40:55–1.18 and 1.23). While the primary purpose of the statute is to upgrade and standardize filed maps, from an engineering standpoint, for the protection of purchasers of platted land, it is to be observed that some elementary land planning and control incidentally flows from the requirement of municipal approval of the map and the streets indicated thereon.

The map plaintiffs submitted for approval showed a new 50 foot wide street, Taffy Lane, running east from Ocean

Avenue for about 450 feet and terminating in a cul-de-sac. Its north side line was located 25 feet south of the north boundary of plaintiffs' tract, which was contiguous to three lots fronting on the south side of Wallace Road. Plaintiffs' map indicated three lots, each 25 feet deep, located between the new street and the north boundary. Plaintiffs said they proposed to convey these small parcels to the owners of the lots on the south side of Wallace Road, which would cause the rear lines of these lots to abut the north side of Taffy Lane. The remainder of the tract was divided into four properly sized lots — three abutted the south side of Taffy Lane, and the fourth was located between the cul-de-sac and the high water line.

It is apparent that at this stage plaintiffs sought to accomplish their aim by complying with all pertinent ordinance provisions then in effect rather than by attacking the validity or applicability of any of them. They were willing to completely improve Taffy Lane in accordance with the street ordinance and obviously proposed to dedicate it. Further, they say that they offered to post a bond guaranteeing the installation of such improvements. Upon municipal approval of the street in connection with the approval of the map, they intended, as later events showed, to require the borough to accept the street. With that accomplished and the map on file, they would then be entitled, under section 12A of the zoning ordinance, to building permits for the four lots.

The borough governing body denied approval of the map on July 19, 1965 by a resolution which set forth no reason for the action. Subsequent depositions of the voting members of the governing body indicated that the denial was based on a dislike of the layout, including the fact that following transfer of the three undersized lots the rear line of the Wallace Road properties would abut the north side of the new street. Although not mentioned, it is clear that the submitted map did not have endorsed thereon the earlier referred to certifications of borough officials required by the map filing law. Moreover, the three 25 foot lots obviously

violated the minimum depth requirement of the zoning ordinance, at least until they were conveyed and incorporated into the adjoining Wallace Road lots. Thereafter, plaintiffs commenced their first action in the Law Division, seeking to compel the governing body to approve the map, and the Borough Clerk to sign and file it. They moved for summary judgment, at the hearing on which the trial judge stated, over the municipality's objection, that he would order the map approved if it were revised to locate Taffy Lane along the north line of the property, thereby eliminating the 25 foot lots and increasing correspondingly the size of the three lots abutting the south side of the lane.

Plaintiffs then submitted a revised map to the governing body which again denied approval on January 25, 1966. The denial was reported to the court, and judgment was entered on January 28, 1966 directing the filing of the map. Plaintiffs filed it with the County Clerk on February 2, 1966, and it represents the subdivision layout which plaintiffs have since pursued. However, it still did not contain the required municipal certifications.

A few days later plaintiffs applied to the governing body to accept Taffy Lane and to that end offered to do what was required of them. The application was denied on February 23, 1966.

In the meantime, on February 8, 1966, the governing body supplemented the street ordinance ("the street ordinance amendment") in pertinent part as follows:

"Section 4. That no road, avenue, street or highway shall be accepted for dedication [sic] by the Borough of Deal which is within two hundred fifty (250) feet of an accepted and existing street.

"Section 5. No road, avenue, street or highway shall be accepted for dedication [sic] which does not have lots fronting on both sides of said street, avenue, road or highway."

This amendment, if valid and applicable, dealt a fatal blow to plaintiffs' proposed subdivision (Plaintiffs challenge it, as well as section 12A of the zoning ordinance). The re-

quirement that lots front on both sides of a proposed street precluded the layout of Taffy Lane on the revised map, since only the rear of the Wallace Road lots would abut its north side line. The requirement that there be a 250 foot separation between parallel streets, coupled with the zoning ordinance provision specifying a 150 foot minimum lot frontage and 125 foot depth, would on its face preclude any other layout of lots involving a new street, since the tract is only 300 feet wide and the two closest streets, Wallace Road and Clem Conover Road, are each only 150 feet from the boundary lines of plaintiffs' property.[1]

Consequently plaintiffs commenced a second suit on March 8, 1966. Two days before that the municipality had filed a notice of appeal from the judgment directing the filing of the revised map. In this second action they shifted position from one of compliance with ordinance provisions to an attack thereon; they now sought to set aside the street ordinance amendment as arbitrary and unreasonable or, in the alternative, to declare it inapplicable to Taffy Lane because the map showing that street had been filed prior to its passage. In addition, the complaint asked for a declaration that the plaintiffs were entitled to building permits for the lots shown on the revised map, and for a judgment directing the governing body to accept Taffy Lane.

The Appellate Division decided the municipality's appeal from the judgment directing the filing of the revised map on

---

[1] A layout, which plaintiffs suggest in their reply brief in this court, showing a lot extending 150 feet along Ocean Avenue, followed by a 50 foot new street leading to interior lots, and then a lot extending 100 feet along Ocean Avenue, with a depth of at least 150 feet along the new street, seemingly could not pass muster without the grant of a variance. This appears to be so because another zoning ordinance provision states that "In case of a corner lot the greatest dimension is its depth and its least dimension is its main frontage", and the second lot mentioned would therefore only have a frontage of 100 feet as against the 150 foot requirement of the zoning ordinance. Plaintiffs do not attack the reasonableness of the minimum frontage requirement.

June 22, 1966. 91 *N. J. Super.* 488. The court held that summary judgment for the plaintiffs should not have been entered with respect to the revised map, since no issue had been framed by the pleadings thereon, and that, in any event, a trial court should not direct the filing of a map without requiring strict compliance with all the requirements of the map filing law, which were not met here because of the absence of the municipal certifications. Moreover, the court pointed out that the recently adopted street ordinance amendment (in force at the time of the determination of the appeal), as well as section 12A of the zoning ordinance, if valid, might give the borough a meritorious basis for refusing to approve Taffy Lane as shown on the revised map. It therefore reversed the judgment, directed amendment of the pleadings and remanded the matter for trial on issues thus derived.

Thereafter, following the denial of a formal application for building permits, the plaintiffs amended their complaint in the first suit, the two actions were consolidated and a pretrial conference held. The result was a suit involving a constitutional attack on both the street ordinance amendment and section 12A as arbitrary and unreasonable. Further, plaintiffs claimed that the former is an unlawful attempt to regulate land subdivision, because outside the methods prescribed by the Planning Act, and that the latter also exceeds municipal power because it goes beyond section 1.39 of the Official Map and Building Permit Act. Alternatively plaintiffs, shifting position again, for the first time said that Taffy Lane is to remain a private road (although they are still willing to improve it consistent with the street ordinance) and so claimed that neither the street ordinance amendment nor section 12A is applicable. On these bases they contended that the borough officials should be required to approve the lane and to certify the revised map, and that they should receive a declaration of entitlement to building permits for the lots shown thereon.

The issues were submitted to the trial court as questions of law, except the matter of the overall reasonableness of the 250 foot separation between streets, with respect to which plaintiffs introduced expert testimony. The court found that the street ordinance amendment was not beyond municipal power, that the provisions thereof were reasonable and valid, that they were applicable to Taffy Lane, and that these conclusions justified municipal refusal to approve the map for filing. Since the map could not be filed, plaintiffs would not meet even the requirement of section 1.39 of the Official Map and Building Permit Act that building permits shall not issue unless the lot abuts a street shown on a filed map. So the court found it unnecessary to pass on the validity of section 12A. Accordingly, judgment was entered for the borough.

The Appellate Division, in affirming the trial court on plaintiffs' appeal, 98 *N. J. Super.* 344, held:

1. Treating Taffy Lane as a private street and agreeing that a map submitted for municipal approval under the map filing law may contain proposed private as well as public streets, the municipality may decline to approve such a private street where it fails to meet ordinance requirements for public streets, — here the street ordinance amendment requirements of a 250 foot separation between parallel streets and of lots fronting on both sides of the street. This is so because the municipality may take into account the potentiality of the private street for later public acceptance and the fact that it is, from inception, to all intents and purposes a public thoroughfare for general traffic and emergency vehicles to the houses fronting thereon. Proper refusal to approve the street validly precludes approval and filing of the map. 98 *N. J. Super.*, at 352–354.

2. The requirements for granting building permits contained in section 1.39 of the Official Map and Building Permit Act, which allow issuance for lots on suitably improved private streets, do not prevent, on the thesis of state pre-

emption, a municipality from additionally requiring that the lot abut a public (accepted) street, as section 12A of the zoning ordinance mandates here. This municipal requirement is intended as a safeguard against possible future deterioration of a private street as the means of access to the structures located on it. Although not expressly stated, the conclusion also implies a finding that the section is, on its face, not unreasonable and so not unconstitutional. 98 *N. J. Super.*, at 354–355.

3. The street ordinance amendment provisions relating to street separation and lot frontage are not shown to be unreasonable and arbitrary and so are not unconstitutional. They are proper enactments grounded in entirely appropriate governmental considerations and interests. 98 *N. J. Super.*, at 356–358.

4. The ordinance provisions complained of and the municipal action with respect to plaintiffs' land do not amount to such an exercise of subdivision control as to be prohibited except through implementation of the Planning Act. Rather they are proper under other powers residing in all municipalities to control and regulate public streets, to adopt reasonable police power regulations and the like. 98 *N. J. Super.*, at 358–359.

5. The combined effect of the municipal action here does not unreasonably deprive plaintiffs of the fair use of their property. Their difficulty arises from the narrowness of the tract on the one hand and its great depth on the other. 98 *N. J. Super.*, at 359–360.

In this court plaintiffs make essentially the same contentions upon which the Appellate Division passed. They suggest, however, that, although adhering to the layout shown on the revised map, they are no longer interested in municipal approval and filing of it. As we have said, there is no requirement to that effect in a municipality which has no subdivision regulation ordinance under the Planning Act. Owners may convey subdivided portions of a tract by metes

and bounds in such communities. But we fail to understand how such a further shift of position really aids plaintiffs in their aim to obtain a declaration that they are entitled to building permits on this layout.

We agree with the result reached by the Appellate Division. However, in the final analysis, we think that result should be grounded solely on the validity and applicability of the borough's street ordinance amendment, in particular that portion requiring a 250 foot distance between parallel streets. To explain why we think this is so, involves consideration, among other things, of the extent of a municipality's power to control land subdivision and development where it has not chosen to implement the Planning Act. Expression of our views in this area is desirable not only for the proper resolution of this case but also as future guidance in analogous situations.

The matter of what powers a non-implementing municipality has is best approached by a brief review of what new powers the Planning Act granted to those municipalities utilizing it, and the evils which the act was intended to meet. The broad purpose of the 1953 act, as well as that of its 1930 predecessor (*R. S.* 40:55–1 to 21, inclusive; *L.* 1930, *c.* 235 as amended), is "to afford municipalities desiring the advantages of its provisions [the power] to enact comprehensive regulatory standards which would facilitate sound and orderly future municipal growth along preconceived lines, in short a planned community growth". *Lake Intervale Homes, Inc. v. Township of Parsippany-Troy Hills,* 28 *N. J.* 423, 435 (1958). See also *Mansfield & Swett, Inc. v. Town of West Orange,* 120 *N. J. L.* 145 (*Sup. Ct.* 1938).

To accomplish this purpose, the Planning Act first authorizes a Planning Board. (The general scheme was the same in both the 1930 and 1953 statutes; we will generally refer only to the latter). That body is empowered to prepare and adopt a master plan of an essentially non-binding nature (*N. J. S. A.* 40:55–1.10) — "a composite of the mapped and written proposals recommending the physical develop-

ment of the municipality", *N. J. S. A.* 40:55–1.2.[2]
Further, which principally concerns us here, the Board is
given power to regulate land subdivision and development
for building purposes, upon the passage of an implementing
ordinance by the governing body. Such regulation is to be
accomplished through the mechanics of compulsory sub-
division plat approval meeting specified conditions required
by the public interest, *N. J. S. A.* 40:55–1.14 and 1.20, and
the imposition upon the developer of the installation of im-
provements, *N. J. S. A.* 40:55–1.21. The details of the
subdivision regulation scheme are fully spelled out in *Levin
v. Township of Livingston,* 35 *N. J.* 500, 507–515 (1961)
and *Hilton Acres v. Klein,* 35 *N. J.* 570, 579–580 (1961)
and need not be repeated here. (Throughout this discussion
we are referring to subdivisions requiring new interior
streets).

The evil which subdivision control was originally designed
to remedy was the baneful consequences to municipalities
and purchasers of premature and reckless platting of vast
areas for building lots during the unregulated land boom
of the 1920s. In this connection see *Lake Intervale, supra*
(28 *N. J.,* at 435–436); *Levin, supra* (35 *N. J.,* at 506–

---

2 Another authorized planning device is an official map of the
municipality to be adopted by ordinance of the governing body rather
than by the Planning Board. In 1930 this permissive provision was
contained in the same enactment with the master plan and sub-
division regulation provisions. *R. S.* 40:55–8. In 1953 the authoriza-
tion was given in a companion measure to the Planning Act, the
Official Map and Building Permit Act, *N. J. S. A.* 40:55–1.30 to
1.42, inclusive. The broad effect of such a map is to conclusively
show the location and width of present and proposed streets, drainage
rights of way and flood control basins and the location and extent
of present and proposed public parks, playgrounds, and scenic and
historic sites. *N. J. S. A.* 40:55–1.31 and 1.32; see also *N. J. S. A.*
40:55–1.2 as amended by *L.* 1968, c. 447. The detailed effects of the
adoption of such a map do not concern us and need not be gone
into. See *Lomarch Corp. v. Mayor of Englewood,* 51 *N. J.* 108
(1968). It is enough to say that it can be a device for putting some
teeth in the otherwise advisory effect of certain physical aspects of
a master plan.

507). These problems were accentuated after World War II as a result of the population explosion, the mass production of homes, and the exodus of families from the older cities to new living areas. Unless basic conditions of good development design and standards, with appropriate reference to the whole community, as well as adequate improvements, were required, house purchasers were likely to be defrauded, municipalities would ultimately have to correct bad conditions at great expense and potential suburban slums would be created. The Planning Act procedures for subdivision regulation, including the installation of all improvements by the developer, where utilized, have effectively eradicated most of this evil. It is difficult then to understand why every municipality with any vacant land has not implemented the statute.

On the other hand, a landowner-developer knows that, upon compliance with the precise statutory and implementing ordinance requirements, he cannot be arbitrarily refused development approval and the right to subdivide, improve and sell his land. Further, because by definition, the streets shown upon an approved plat meet municipal requirements, they must be accepted as public streets when the improvements are completed, with future maintenance a municipal obligation, to the benefit of both house purchasers and the developer. See *New Jersey Highway Authority v. Johnson*, 35 *N. J. Super.* 203 (*App. Div.* 1955); Cunningham, *Control of Land Use in New Jersey*, 15 *Rutgers L. Rev.* 1, 23 (1960).

For the most part the powers granted by the Planning Act were not previously available to municipalities. It necessarily follows that municipal subdivision regulation may only be undertaken pursuant to and under the procedures and methods spelled out in the Planning Act and implementing ordinances adopted under its authority. Indeed in *Magnolia Development Co., Inc. v. Coles*, 10 *N. J.* 223 (1952), this court held that a borough, which had not implemented the act, could not by an ordinance require a developer to con-

struct streets, sidewalks, curbs and other improvements as a
condition precedent to municipal approval of a plat under
the map filing law. We there said: "If the defendant borough
desires to exercise its police powers with respect to the
regulation of new developments within its boundaries, it must
do so within the framework of the statutes provided for such
purposes, namely *R. S.* 40:55–1 *et seq.* [the then Planning
Act], and *R. S.* 40:56–1 *et seq.* [the local improvement assess-
ment statute]." 10 *N. J.*, at 228. Accord: *Reid Development
Corp. v. Township of Parsippany-Troy Hills,* 10 *N. J.* 229,
238 (1952); *Swimming River Golf & Country Club v.
Borough of New Shrewsbury,* 30 *N. J.* 132, 135 (1959);
*City of Rahway v. Raritan Homes, Inc.,* 21 *N. J. Super.* 541
(*App. Div.* 1952); *Gruber v. Raritan Township,* 68 *N. J.
Super.* 118, 129–134 (*Law Div.* 1961), reversed on other
grounds, 73 *N. J. Super.* 120 (*App. Div.* 1962), affirmed 39
*N. J.* 1 (1962). See Cunningham, *supra* (15 *Rutgers L. Rev.,*
at 28).

*Angermeier v. Borough of Sea Girt,* 27 *N. J.* 298 (1958),
noted by the Appellate Division in the instant case (98 *N. J.
Super.,* at 359), does not hold to the contrary. The question
in that case was whether a zoning ordinance provision (the
municipality had no Planning Board or subdivision or-
dinance) that plats in a certain district could not be "re-
arranged", *i. e.,* subdivided, other than as set forth on a cer-
tain map without the permission of the governing body, was
valid. The proposed "rearrangement" did not involve a new
street. The precise holding of the case was that the ordinance
was invalid because it lacked appropriate standards. Dicta
in the opinion (27 *N. J.,* at 305-311) with respect to mu-
nicipal subdivision control powers means no more than that
a municipality which has not implemented the Planning Act
may nevertheless exercise such incidental control over land
subdivision as may be validly derived from powers other
than those granted by the Planning Act, including proper
zoning ordinance provisions. Clearly *Angermeier* does not
hold that the installation of subdivision improvements where

new streets are involved may be imposed upon a developer if the municipality has not implemented the Planning Act. See Cunningham, *supra* (15 *Rutgers L. Rev.*, at 27–29).

Therefore it is to be observed that, although plaintiffs have not attacked the original street ordinance provisions which require the installation of paving, curbs, sidewalks, sanitary sewers and the like at the developer's expense (improvements substantially identical to those which the governing body may require in connection with plat approval under section 1.21 of the Planning Act) before a new street is eligible for acceptance as a public way, and indeed offered to comply therewith, such requirements plainly go beyond Deal's powers absent implementation of the Planning Act.[3]

This brings us to the nub of the present controversy, namely, the validity and applicability of the street ordinance amendment, particularly that portion mandating a 250 foot distance between parallel streets. The pivotal question here is whether a municipality which has not implemented the Planning Act is nevertheless empowered to determine the *location* of new interior streets which are needed by a property owner to develop a tract for building purposes. Two general observations should initially be made. First, the hypothesis of the Planning Act is a grant of new and additional municipal power to control land subdivision and development. The corollary is that prior to that enactment, municipalities had little power in this area; and, of course, those today which have not implemented the act have no more. Certainly they may not preclude development by onerous restrictions. Second, absent municipal implementation of the Planning Act, landowners can lay out private streets through their lands which will remain such, without

---

[3] We do not pass upon the question, adverted to by the Appellate Division (98 *N. J. Super.*, at 355), whether a municipality which has not implemented the Planning Act may refuse to accept a dedicated street needed to develop land if the proposed street meets all reasonable and proper requirements within the power of such a municipality to impose.

municipal maintenance, until they are dedicated and accepted. This is essentially the foundation of plaintiffs' present thesis. A plat submitted for approval under the map filing law in such a community is not improper simply because it showed the new streets thereon as private. See *Loveladies Property Owners Association, Inc. v. Barnegat City Service Co., Inc.*, 60 *N. J. Super.* 491, 502 (*App. Div.* 1960), commented on by the Appellate Division here, 98 *N. J. Super.*, at 355.

We hold that a municipality has power over the location and width of new streets proposed by land developers and that such power extends to thoroughfares like Taffy Lane, despite the fact that they are presently to remain private ways. That power derives from *N. J. S. A.* 40:67–1 providing: "The governing body of every municipality may make, amend and repeal ordinances to: a. Ascertain and establish the boundaries of *all* streets, highways, lanes, alleys and public places in the municipality * * *." (Emphasis supplied). Clearly the power is a broad one. *Cf. Hoglund v. City of Summit*, 28 *N. J.* 540 (1959); *Erie Railroad Co. v. City of Passaic*, 79 *N. J. L.* 19 (*Sup. Ct.* 1909). It is recognized in the map filing law, with respect to streets shown on a map sought to be filed, in the provision thereof requiring that there be endorsed on the map a certification "that the municipal body has approved such streets, avenues, roads, lanes or alleys, except where such map is prepared and presented for filing by the State of New Jersey or any of its agencies." *N. J. S. A.* 46:23–9.11, *subd. p.* "Approval" in this sense connotes that the governing body has thereby declared that such a street conforms with applicable municipal requirements, including at the least location and width regulations, and is therefore amenable to acceptance at some future time.[4]

---

[4] What we have just said would not extend to proposed streets shown on those plats, filed under prior map filing laws before the passage of the 1953 Planning Act, which, by virtue of the holding in

 As the Appellate Division correctly observed, such "approval" power extends to private streets, as well as public thoroughfares, shown on such a map because of the potentiality for later municipal acquisition. 98 *N. J. Super.*, at 352–353. We are, of course, speaking throughout only of "full-fledged" streets, as Taffy Lane is proposed to be here, and not of mere private lanes extending by easement or other private arrangement across lands of others to reach one, or perhaps two, isolated houses constructed on separate rear lots not directly abutting "full-fledged" streets.

 Moreover we are fully in accord with the holding of the Appellate Division that Deal's 250 foot street separation requirement applies to both public and private streets and is not unreasonable. See 98 *N. J. Super.*, at 356–358. We also note in passing that the 250 foot distance is designed to correlate with the 125 foot depth requirement of the zoning ordinance to enable back-to-back lots meeting this depth requirement. The provision, although a supplement to the ordinance setting forth improvement requirements for acceptance of a street, at least some of which we have indicated are beyond municipal power, should be construed as an overall declaration of municipal policy quite apart from the detailed improvement specifications set forth in the original ordinance. (Incidentally, there is nothing in the record to indicate that the 17 streets, previously referred to, running east from Ocean Avenue are not separated by at least the 250 foot distance).

 In sum we hold that a municipality may validly require a minimum distance between parallel streets, applicable to both public and private thoroughfares, under its broad statutory grant of power relating to streets, that Deal has done so by ordinance here, that this provision is applicable to plaintiffs' proposed new street, and that it justifies

*Lake Intervale Homes, Inc. v. Township of Parsippany-Troy Hills, supra* (28 *N. J.*, at 439), are subject to the provisions of that act and an implementing subdivision regulation ordinance.

the borough's refusal to approve plaintiffs' revised sub-
division map. Finally plaintiffs' position is not improved be-
cause they now say they no longer desire to file the map and
simply seek a declaration of entitlement to building permits.
The layout of Taffy Lane and the subdivision as proposed re-
main the same even if the map is not submitted for ap-
proval and filing. We think under such circumstances Deal
could prevent the use of the street so violating its valid policy
and, incidental thereto, the erection of buildings fronting
thereon, regardless of section 1.39 of the Official Map and
Building Permit Act and section 12A of the zoning ordinance.

On this basis we affirm the Appellate Division's judgment.[5]
However, we think we should make some comment about the
specific statutory and ordinance building permit regula-
tions also passed upon by that court.

As we have said, the Appellate Division also held, as
a further basis for its decision in favor of defendants, that
section 12A of the zoning ordinance, in effect requiring that
a lot front on an accepted (public) street before a building
permit can be issued, was not preempted by section 1.39 of
the Official Map and Building Permit Act, which states
that no building permit shall issue unless the lot abuts,
*inter alia,* a street (public or private) shown on a plat
duly filed prior to the passage of an ordinance implementing
the Planning Act. Additionally the court inferentially held
that section 12A was not unreasonable on its face. Although
section 1.39 authorizes the issuance of permits for buildings
on private streets shown on maps previously filed under the
map filing law (as well as on streets shown on a subdivision

---

[5] It will be noted that we have not discussed that provision of
the street ordinance amendment requiring that a new street (pub-
lic or private) have lots fronting on both sides thereof, which the
Appellate Division also found valid and applicable. (98 *N. J. Super.*, at
357–358). While the requirement seems an unusual one, we are not
prepared to say that, at least in a community like Deal, it is not
reasonable on its face, although, as the Appellate Division points out,
(98 *N. J. Super.*, at 358, *n.* 1), in many situations its application will
be unreasonable and subject to judicial condemnation.

plat approved pursuant to the Planning Act) if suitable improvements have only been guaranteed, section 12A goes further and precludes a permit unless the street is a public one. The holding below assumes that section 1.39 applies in municipalities which have not implemented the Planning Act. We have considerable doubt as to these propositions and think they should be left open. Their importance, however, indicates an urgent need for legislative clarification, especially as to the intended coverage and preemptive character of section 1.39.

Municipal power to require building permits prior to construction is found in *N. J. S. A.* 40:48–1(13) authorizing every municipality to adopt ordinances to "[r]egulate and control the construction, erection, alteration and repair of buildings and structures of every kind within the municipality; and to prohibit, within certain limits, the construction, erection or alteration of buildings or structures of wood or other combustible material". This authority has generally been exercised in the context of ordinances requiring compliance with building codes and similar safety essentials as well as with zoning ordinance provisions governing permissible use, lot size, setback and building area requisites and the like, *i. e.*, considerations confined to the particular building and lot involved. Attempted regulation of extraneous matters has generally been struck down. See *e. g., Antonelli Construction Co. v. Milstead,* 34 *N. J. Super.* 449 (*Law Div.* 1955); *United States Home & Development Corp. v. LaMura,* 89 *N. J. Super.* 254 (*App. Div.* 1965). (There is no indication in the present record whether Deal has any ordinance provision relating to building permits other than section 12A).

The only other statutory enactment beyond section 1.39 dealing with the subject that we know of is *N. J. S. A.* 58:11–25, which is contained in the Realty Improvement Sewerage and Facilities Act (1954) and is of general application without implementation by municipal ordinance. The thrust is to protect public and private health. It pro-

vides that no building permit shall be issued for the construction of a building improvement until the board of health having jurisdiction shall have certified that the proposed water supply and sewerage facilities for the structure comply with the provisions of the act and the standards for construction of such facilities prescribed either by the state department of health or a local ordinance, whichever standards are higher.

The thrust of section 1.39 of the Official Map and Building Permit Act, earlier quoted in full, is to assure adequate access to every structure for emergency vehicles necessary to protect health and safety. This is accomplished by requiring abutting lots to front on specified kinds of streets, suitably improved or their improvement guaranteed, before permits may issue. This basic purpose is demonstrated by the provisions of section 1.40 setting up a means of relief through the Board of Adjustment in cases of practical difficulty or unnecessary hardship or where the circumstances do not require the structure to be related to a street. By virtue of section 1.40, the section 1.39 requirements of street frontage may be dispensed with, provided adequate access for emergency vehicles is assured by some lesser means of access which will also "protect any future street layout shown on the official map or on a master plan of streets duly adopted by a planning board". The purpose is certainly a salutary and laudable one and the state could validly require its effectuation in all municipalities, as in the case of the health law provision just referred to. We have doubt, however, whether the legislature intended the sections to be applicable to municipalities which have not implemented the Planning Act despite some of its seeming broad language and the fact that they are now found in a separate enactment.

Section 1.39's legislative history furnishes a substantial basis for our doubt. The idea of building permit regulation as a part of planning derives from the Standard City Planning Enabling Act prepared by the United States Department of Commerce in 1928. Section 19 of that act provides

that after a planning commission shall have adopted a major street plan, building permits shall not issue unless the lot abuts a public street or a street shown on the master plan or an approved subdivision plat. In our 1930 Planning Act, largely adapted from the standard act, regulation as to building permits is found in *R. S.* 40:55–18 thereof, providing that no such permit shall be issued unless a street or highway giving access to the proposed structure "has been duly placed on the official map or master plan". This language, as well as the entire context, makes it clear to us that the provision was to be applicable only in municipalities implementing that act.

In 1953 when the revised planning statute, *N. J. S. A.* 40:55–1.1 *et seq.*, was adopted, provisions with respect to the official map[6] and building permits were placed in a separate statute, *N. J. S. A.* 40:55–1.30 *et seq.*, adopted simultaneously. But the statements annexed to both bills speak of the two statutes together as setting forth "an entirely permissive set of legislation", providing "a basis for planning and control of land development" and giving "a closely related set of legislation for the equitable control of land development".

As far as precedent is concerned, the only cases directly applying sections 1.39 and 1.40 arose in communities which had a planning board and a subdivision regulation ordinance. *Phillips v. Westfield Board of Adjustment,* 44 *N. J. Super.* 491 (*App. Div.* 1957), certification denied 24 *N. J.* 465 (1957); *Noble v. Township Committee of Mendham Township,* 91 *N. J. Super.* 111 (*App. Div.* 1966), certification denied 48 *N. J.* 120 (1966).

As a matter of logic, much can be said for the view that section 1.39 was only intended to apply in municipalities

---

6 The same doubt exists as to whether authority to adopt an official map extends only to municipalities which have implemented the Planning Act. It is at least interesting to note that the Municipal Planning Controls Survey, earlier mentioned, indicates that no municipality has adopted an official map which had not created a Planning Board and enacted a subdivision regulation ordinance.

having a planning board and a subdivision regulation ordinance. The legislature was by both 1953 acts (and by the earlier, less detailed 1930 act as well) conferring new, comprehensive and optional powers on municipalities to plan and regulate growth and development, but only if certain specified methods and procedures designed to afford fair protection to the community, the landowner and the ultimate purchaser were followed. The two acts appear to provide a single, integrated scheme which, as we have earlier said in another connection, should be fully complied with in order to take advantage of the new powers. It would seem that the legislature at least *expected* every municipality to take advantage of the beneficial provisions of the two companion statutes. At best its intent is ambiguous, and clarification is needed.

As to section 12A of Deal's zoning ordinance, we have no doubt that the borough could, under the police power, *N. J. S. A.* 40:48–2, validly adopt an ordinance providing that no building permit may issue unless the lot has a sufficiently improved means of access for emergency vehicles, in all weather, by public or private street or lane. This in effect is the state policy behind sections 1.39 and 1.40. Section 12A, however, goes much further than is necessary from the public interest standpoint in requiring an accepted street and in essence amounts to a backhanded attempt at subdivision regulation. Although not deciding the point, we are presently inclined to the view that the ordinance provision goes too far.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.