584 A.2d 1350

JAMES NIGRO, PLAINTIFF–APPELLANT, v. PLANNING
BOARD OF THE BOROUGH OF SADDLE RIVER,
DEFENDANT–RESPONDENT.

Argued October 22, 1990—Decided February 5, 1991.

*Douglas K. Wolfson* and *Robert E. Martini* argued the cause for appellant (*Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein,* and *Robert E. Martini,* attorneys; *Douglas K. Wolfson,* of counsel; *Robert E. Martini* and *Eric F. Frizzell,* on the briefs).

*Stuart R. Koenig* argued the cause for respondent (*Stickel, Koenig & Sullivan,* attorneys).

*Stewart M. Hutt* submitted a brief on behalf of *amicus curiae,* New Jersey Builders Association (*Hutt & Berkow,* attorneys; *Stewart Hutt, Susan R. Kaplan,* and *Mark Williams,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

In this case, we consider the binding nature of a municipality's official map on local planning board decisions regarding subdivision approvals.

The Demarest family owns a twenty-seven-acre farm in Saddle River. Plaintiff, James Nigro, entered into a contract with the Demarests to purchase ten acres of their property. The subject property was landlocked. In his subdivision application, Nigro proposed an access road servicing the proposed lots through an additional piece of property fronting on Twin Brooks Road that he bought for that purpose. The official map of Saddle River showed no road on Nigro's property but showed a "proposed street" on the portion of the Demarest property not sold to Nigro but retained by the Demarests for farming.

In March 1988, defendant, the Saddle River Planning Board ("Planning Board" or "Board"), denied Nigro's application for preliminary approval of a major subdivision. Admitting that the case presented "a close question," the Board ruled that Nigro's application failed to conform to the intent of the Saddle River master plan, and that the location of the subdivision access road on Nigro's property conflicted with the proposed street on the official map, located on the Demarest property, which the Board deemed "conclusive" and binding under *N.J. S.A.* 40:55D–32. That statute provides, in part, that a town's "official map shall be deemed conclusive with respect to the location ... of streets ..., whether or not such streets ... are improved or unimproved or are in actual physical existence."

The Law Division reversed the Planning Board on two grounds: (1) that "non-compliance with proposed streets does not amount to non-compliance" with the subdivision ordinance or the official map; and (2) that the denial of the application was arbitrary and capricious. On appeal, the Appellate Division reversed, holding that *N.J.S.A.* 40:55D–32 rendered the official map "statutorily conclusive with respect to the street location." *Nigro v. Planning Bd. of Saddle River,* 237 *N.J.Super.* 305, 306, 567 *A.*2d 1010 (1989). The Board "therefore could not lawfully approve a proposal that failed to conform to the official map." *Ibid.*

We granted Nigro's petition for certification, 121 *N.J.* 627, 583 *A.*2d 323 (1990), to consider the conclusiveness of an official map in the planning process, and now reverse.

I

George Demarest and his wife, Elizabeth, own a 27.2–acre plot of land that the family has farmed for over a century. The Demarests want to continue to farm some property, but, as Mr. Demarest testified, since they are getting older, they want to sell some of their acreage. They decided to sell ten acres in the southerly portion of their property and to continue farming

their remaining land.[1] Mr. Demarest further testified that he refused Nigro's offer to purchase the entire tract. He explained that it would be impossible to bring a road in from Glenwood Drive and farm in the back of the tract. Finally, he stated that he and his family are still active, do not want to give up farming, and have a son and daughter-in-law who desire to continue farming.

Accordingly, Nigro contracted to purchase approximately ten acres that constitute the southwest corner of the Demarest family farm. The entire farm is circumscribed by the rear portions of developed residential properties along Glenwood Drive to the north and along Twin Brooks Road to the south. Nigro's plot abuts no streets currently in existence; it is effectively landlocked. For the sole purpose of gaining access to the ten acres, Nigro purchased for $1,900,000 an adjacent property fronting Twin Brooks Road.

Thereafter, on January 14, 1988, Nigro applied to the Planning Board for preliminary approval of a major subdivision of his plot, providing for four residential lots. The Board had rejected Nigro's previous application for subdivision of the same property in October 1987. The lots proposed in the 1988 application conformed to the required areas and frontages of local zoning laws. Nigro's plan proposed an access road (hereinafter "access road") from Twin Brooks Road, running north into the ten-acre plot, and ending in a cul-de-sac on the property he is acquiring. However, the official map shows the only proposed street in the area (hereinafter "proposed street") as running south and west from Glenwood Drive across the Demarest Farm and ending in a cul-de-sac.

On March 22, 1988, the Planning Board denied Nigro's application because it failed to conform to the intent of the master

---

[1]Plaintiff's figures regarding the purchase (10 acres of a 27.2–acre farm) differ from those cited in the Appellate Division opinion (8 acres of a 25.5–acre farm) but that difference is of no consequence here.

plan in that it proposed two cul-de-sacs, whereas the master plan indicated only one. The Board also stressed that the proposal for a new street in the plan could not be approved because it deviated from the proposed street on the official map layout, which the Board deemed conclusive under *N.J.S.A.* 40:55D–32.

> The basic conflict arises in creating a public street in an area where single family residential homes exist where no street was ever contemplated, and in a location not conforming to the planning process of the municipality which clearly contemplated development from Glenwood Drive.
>
> [Planning Board Resolution, Mar. 22, 1989.]

Both the access road and the proposed street end in cul-de-sacs, the access road's cul-de-sac being located entirely on the property to be acquired by Nigro. Before the Board and the Appellate Division, it was never asserted that the proposed street or its cul-de-sac encroached on the acreage being sold to Nigro. After argument, however, the parties presented conflicting maps. Nigro's map indicates that although close, the proposed street and the access road do not overlap. The Board's map, however, shows the cul-de-sac of Nigro's proposed access road lying in the route of the official map's proposed street. Nigro's counsel represented that the Demarests would sell to Nigro the small portion of property necessary to insure that the two roads would not overlap. As an alternative, the access road could undoubtedly be redesigned to avoid any overlap.

## II

In reviewing the question of whether the location of proposed streets shown on an official map is conclusive and binding on a planning board, we first review the history of official maps and master plans in New Jersey as the contextual background for our consideration of the statutory scheme of the Municipal Land Use Law (MLUL). *N.J.S.A.* 40:55D–1 to –129.

## A. *History of the Official Map*

The term "official map" was first used by Basset and Williams in their model "County Planning Enabling Act" published in 1935. Anderson, *Law of Zoning in New Jersey* § 24.01 (1989). Although an official map is a precise map, showing the existing and proposed streets, highways, drainage systems, and other public improvements, it is essentially a tool of planning, rather than zoning. An official map "does not portray the zoning districts or relate to the zoning plan except insofar as both the zoning scheme and the official map undertake to implement a common plan for the development of land." *Ibid.*

Originally, official maps were regarded as mere descriptions of future plans for public improvements. Their function was one of simple notification. In an early case, the United States Supreme Court explained:

> The object of the recording of the map is to give notice to all persons of the system of highways proposed to be established by subsequent proceedings of condemnation. It does not restrict in any way the use or improvement of lands by their owners before the commencement of proceedings for condemnation of lands for such highways, nor does it limit the damages to be awarded in such proceedings.

[*Bauman v. Ross*, 167 *U.S.* 548, 597, 17 *S.Ct.* 966, 985, 42 *L.Ed.* 270, 291 (1897).]

Later views, however, have given more authority to the plans proposed in official maps. "If an official map were no more than a graphic expression of a plan for future development its legal effect would be negligible and its practical impact might be slight." Anderson, *Law of Zoning in New Jersey, supra*, at § 24.10. The contemporary view of the official map as a land-use control device thus accords weight to the legal effect of the official map's adoption.

The major premise underlying the adoption of the official map is to provide for orderly municipal growth at the least cost to the taxpayer. 6A *Powell on Real Property* ¶ 874[2] (1990 Supp.). An official map enables a municipality to limit development of lands designated or delineated for future public use and thereby reduce the cost of eventual condemnation and shift

some of the cost of public improvements to the developer in connection with the approval process. "The purpose of the official map [is] to insure the proper location and economical acquisition of streets ..." Anderson, *Law of Zoning in New Jersey, supra,* at § 24.02. Once an official map is adopted, it may be used to demonstrate a municipality's determination of the location of streets, parks, and other municipal improvements. The legislation enabling municipalities to adopt official maps may provide for sanctions to limit development on the lands on which public facilities are proposed, and establish the official map as a standard for developmental approval. *See id.* at § 24.06; *N.J.S.A.* 40:55D–32, –34.

However, the official map does not "interpose an insuperable barrier to approval of a plat which shows some alteration of streets ... which are shown on such map." Anderson, *American Law of Zoning,* § 24.08 (1986). "[S]treets, highways, parks, and other proposed public improvements shown on the official map do not prevent the platting and dedication or reservation of new streets, highways and parks ..." *Ibid.* A proposed plat may be approved and filed so long as it "adds streets and makes changes in mapped streets which serve the overall purpose of the community plan ..." *Ibid.*

### 2. *New Jersey Statutory Scheme*

New Jersey's statutory scheme generally follows that outlined above. Article 5, containing the official-map sections of the Municipal Land Use Law (MLUL), establishes that a municipality's governing body "may by ordinance adopt or amend an official map of the municipality, which shall reflect the appropriate provisions of any municipal master plan ..." *N.J.S.A.* 40:55D–32. The official map is defined by the MLUL simply as a map adopted by ordinance pursuant to article 5. *N.J.S.A.* 40:55D–5.

*N.J.S.A.* 40:55D–32, particularly the second paragraph, is the focus of this appeal.

The governing body may by ordinance adopt or amend an official map of the municipality ...

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

The official map shall be deemed conclusive 'with respect to the location and width of streets and public drainage ways and the location and extent of flood control basins and public areas, whether or not such streets, ways, basins or areas are improved or unimproved or are in actual physical existence. Upon receiving an application for development, the municipality may reserve for future public use, the aforesaid streets, ways, basins, and areas in the manner provided in [*N.J.S.A.* 40:55D-44].

[*L.*1975, *c.* 291, § 32, eff. Aug. 1, 1976.]

Until now, we have not directly considered this statute. However, this Court upheld the constitutionality of the predecessor statute, *N.J.S.A.* 40:55-1.32, commonly known as the Official Map Act, in *Lomarch Corporation v. Mayor of Englewood,* 51 *N.J.* 108, 237 *A.*2d 881 (1968). In *Lomarch,* the Lomarch Corporation sought approval of a subdivision on a sixteen-acre plot of land. While the application was under consideration, the municipality amended its official map to show the entire tract as land reserved for use as a park. The municipality granted approval of the subdivision, but warned that " 'The applicant is acting solely at its own peril since the applicant is on notice that this property has been reserved by the [municipality]' " for a one-year period. *Id.* at 111, 237 *A.*2d 881. Lomarch alleged that the municipality was effectively depriving it of the use of its property without compensation because the municipality sought to reserve the property for park land acquisition for a one-year period. The Court in *Lomarch* sustained the Official Map Act, relying on the presumption of constitutionality accorded to legislative acts. It also emphasized that unilateral reservation of land by a municipality brought with it "the implied duty and obligation to make payment of adequate compensation to the landowner for the temporary taking and his deprivation of use." *Id.* at 113, 237 *A.*2d 881. *Lomarch* thus suggests that a takings violation results unless the municipality compensates a landowner whose property the municipality seeks to reserve for some public purpose.

In contrast to official maps, master plans have received extensive consideration from legal commentators and the courts. In New Jersey, the master plan is the centerpiece of land use planning. Pursuant to the MLUL, it is "a composite of one or more written or graphic proposals for the development of the municipality." *N.J.S.A.* 40:55D–5. It may be adopted by a municipal planning board only after a public hearing. *N.J.S.A.* 40:55D–28. Its required contents are numerous and detailed. *Ibid.* Its influence is also far-reaching; indeed, the land use and housing elements of a master plan must be adopted before a municipality adopts a zoning ordinance, *N.J.S.A.* 40:55D–62, and a zoning ordinance inconsistent with or not designed to effectuate the land use and housing plan elements of the master plan must be accompanied by a resolution explaining the inconsistency. *Id.*

Over fifty years ago, the Court of Errors and Appeals first upheld the constitutionality of New Jersey's first master-plan-enabling statute. At that time, Justice Heher already recognized the importance of the planning power for promoting the general welfare.

> The state possesses the inherent authority—it antedates the constitution—to resort, in the building and expansion of its community life, to such measures as may be necessary to secure the essential common material and moral needs. The public welfare is of prime importance; and the correlative restrictions upon individual rights—either of person or of property—are incidents of the social order, considered a negligible loss compared with the resultant advantages to the community as a whole.... A comprehensive scheme of physical development is requisite to community efficiency and progress. [*Mansfield & Swett, Inc. v. West Orange*, 120 *N.J.L.* 145, 150, 198 *A.* 225 (1938).]

Various provisions of the MLUL, including a requirement that the master plan be examined and updated regularly, *N.J.S.A.* 40:55D–89, reflect the continuing importance of the master plan.

## III

Against this background for assessing the conclusiveness of official maps and master plans, we now address the situation in Saddle River. The 1979 Saddle River master plan was devel-

oped from master plans that had been prepared in 1950 and 1968. The 1968 master plan was the first to include a proposed street into the Demarest property. That proposed street ran from Glenwood Drive. The official map of the municipality provides that development of the property in question should be serviced by a roadway from Glenwood Drive; that roadway is identical to the proposed street in the master plan. Indeed, the official map is identical with the street layout depicted on the master plan. The official map has been amended only once, over ten years ago, since its adoption almost two decades ago.

The Saddle River Planning Board held hearings regarding the proposed Nigro subdivision on February 9, 1988, and March 8, 1988. Several of those who took part in the municipality's planning process testified at the hearings, including Robert Strong, the planner who prepared the 1979 Saddle River master plan, and George Demarest. Both Demarest and Strong stated that the proposed street's origin at Glenwood Drive rather than Twin Brooks Road reflects historical happenstance rather than scrupulous planning. Likewise, both Demarest and Strong testified that Twin Brooks was always the most feasible access to the Demarest tract but that Mr. Demarest was unable to secure the right-of-way to Twin Brooks. Mr. Demarest testified:

> Back in about 1966, I was called by the Mayor and Council or Planning Board of Saddle River and there was a subdivision going in north of me, which is now Glenwood, and they wanted me to come over because if they approved it without me getting a right-of-way, the farm would be landlocked the way it was set up on the maps. The only way that the fire department or police department could have gotten in, if they approved the subdivision without any entrance would have been through Hillsdale and the governing body, which is proper, didn't want to have to send any equipment through Hillsdale to get back into Saddle River.

> So I purchased a right-of-way, the 50 foot right-of-way that everybody talks about off Glenwood.... There was no access of [sic] Twin Brooks. But when I was there at the meeting, the planners and the Mayor and Council said the best way to have come in would have been off Twin Brooks and asked me if there was any way I could get an easement or right-of-way in from Twin Brooks.

> Anyway, I couldn't get a right-of-way in from Twin Brooks, so my only other alternative was to buy the easement off of Glenwood.

Mr. Demarest's testimony was supported by that of Robert Strong, a professional planner, who was a consultant to the Saddle River Planning Board from the late 1960s through the adoption of the Master Plan in 1978.

> At that time in 1978 there appeared to be only one alternative. The only available alternative was an easement ... on Glenwood Drive.... That is the way the master plan showed the development of the site because that was the only alternative that was available.

Throughout his testimony Mr. Strong emphasized that Glenwood was chosen not because it was the best but because it was the only available access.

> MR. STRONG: In 1978 we had one option. That was the only thing we had. We didn't go looking to acquire pieces of residential properties in order to gain access. This access existed in 1978. It was the only access that existed within Saddle River.
>
> THE CHAIRMAN: Well, it's the only access that exists today.
>
> MR. STRONG: Now we have another alternative.
>
> THE CHAIRMAN: Not yet.
>
> MR. STRONG: Well, the property has been acquired and it's available.

Further, Mr. Strong testified that the master plan depicted an arrangement of minor streets merely to illustrate the character of earlier streets in Saddle River so that the remaining undeveloped lands would preserve the area's quiet and safe residential character by creating additional streets free from through traffic. The design was meant to be illustrative but not binding on any specific piece of property. Mr. Strong reinforced the view that the master plan should not be read as though it is cast in stone. Referring specifically to the 1978 master plan, Mr. Strong testified:

> Obviously the key here is "possible location." This was not meant to be the only location. What was important, insofar as the master plan was concerned, was to achieve subdivision design which would meet the intent and purpose of the plan. That intent and purpose was to assure the continuance of quiet, safe residential streets.

In Mr. Strong's opinion this subdivision "is totally in accord with the 1978 Master Plan." Moreover, in his opinion, access on Twin Brooks is "actually preferable" to access on Glenwood.

Mr. Strong emphasized that the Twin Brooks access was not available in 1978. He noted two considerations that support approval of Nigro's plan.

One is that this arrangement which is shown, including the future extensions of it, provide shorter cul-de-sacs than that which would be required if the only access would be off Glenwood Drive. That inherently is from a planning standpoint a more desirable way to design in this kind of street system. Cul-de-sacs, which provide lots of benefits for residential areas, also produce lots of problems in terms of municipal services to the area. The shorter they are, the better off the municipality is. You provide the same basic advantages for the residences and you don't provide as many disadvantages to the municipality.

Secondly, and equally important, is that by starting access to the Demarest property at this point, we're starting at the lowest elevation on the property, whereas the scheme that is illustrated on the master plan would start from a relatively high elevation on the property. From a standpoint of engineering design, particularly with respect to drainage and certainly with regard to other potential utility services, this is a far more preferable place to start the development of the entire tract.

Likewise, Mr. Doolittle, the professional engineer and land surveyor who prepared the Nigro subdivision plan, testified that the access road with a grade of seven percent was "absolutely" safer than the proposed street with a grade of twelve to thirteen percent.

Moreover, Mr. Doolittle noted with respect to two subdivision plans of admittedly much larger undeveloped properties, Burning Hollow and High Ridge, that the approved streets in these areas were substantially different from those proposed in the master plan or on the official map. For example, the master plan envisaged one loop road for the entire Burning Hollow development, but seven roads were approved.

As Mr. Doolittle testified with respect to these two new developments:

There's no resemblance to the existing street pattern, comparing that to the 1978 master plan for either one. The developed street pattern is completely different from what is shown on the master plan.

Following testimony by Strong, Demarest, Doolittle, several area residents, mainly from Twin Brooks Road, and others, the Planning Board denied Nigro's application on two separate

grounds. First, the Board concluded that the application undercut the goals of the master plan and did not represent good planning because it created too many cul-de-sacs. Nigro's proposal necessitated two separate roads for the development of the entire Demarest farm while the official proposed street could service the entire farm property. The trial court disagreed, finding that sound planning reasons supported approval of the access road. The court specifically noted that safety considerations favored approval of Nigro's proposal because the grade of the Twin Brooks access road would be significantly less steep than the proposed street from Glenwood (6.91 degrees versus 12.85 degrees). The Appellate Division found that this qualitative evaluation of. planning rationale was not "relevant to the principal issue in this case" and did not address the comparative benefits of the two proposals. 237 *N.J.Super.* at 307 n. 1, 567 *A.*2d 1010.

Second, the Planning Board concluded that *N.J.S.A.* 40:55D–32 prevented it from approving Nigro's application because of its finding that the location of the access road conflicted with the site of the proposed street. The Board acknowledged that "[t]he case might be different if there was no other access available to the property in question." In our view, the Board's conclusion that Nigro's access road was "in conflict" with the proposed street constitutes the critical flaw in the Planning Board's analysis of the case. There is no other access available to Mr. Nigro. The Board, despite Mr. Demarest's testimony that he would not sell Nigro the portion of his property traversed by the proposed street, persisted in its determination that only the Glenwood street would be approved, effectively preventing Nigro from subdividing the property he proposed to acquire.

The resolution also reveals other flaws in the Board's reasoning. By insisting on adherence to streets proposed on the official map for purposes of subdivision approval, the Board appeared to assume that streets shown on the official map are immutable. That assumption is unfounded, particularly when

an official map is infrequently amended or updated, as is the case with Saddle River. Moreover, Nigro points to the two recent decisions by the Saddle River Planning Board granting subdivision approval to applications that contained streets not shown on the official map as support for the view that even the Planning Board does not consider the official map street designations to be binding and exclusive.

In reaching our decision, we consider the nature of an official map. We acknowledge that an official map "is more than a chart to guide future development." Anderson, *Law of Zoning in New Jersey, supra,* at ¶ 24.06. With respect to the designation of major streets, drainage facilities, flood control basins, and public areas, a municipality may properly insist on substantial adherence to the planning choices reflected on its official map, allowing deviations in subdivision or site plan proposals only when reasonably justified by the particular conditions and circumstances. But with respect to its designation of minor roadways, such as the proposed street on the Demarest tract, a municipality should not insist on rigid compliance with its official map. To adopt Saddle River's position would be to elevate the official map to the status of uncompromising forecaster of future development within a municipality. Such a strict view does not comport with the underlying goal of municipal planning: to promote the general welfare. Planning must ultimately be a flexible process, and the fact that the location of a proposed street on an official map differs from that of a street proposed by a developer does not by itself allow or require a planning board to withhold approval of a development proposal. The Board's position unnecessarily restricts the planning process.

To support its affirmance of the Board's decision, the Appellate Division cites *Levin v. Livingston Township,* 35 *N.J.* 500, 511, 173 *A.*2d 391 (1961), presumably because the Court there commented that the planning board must determine whether a proposal conforms to the ordinance design, the master plan, and

the official map, for public convenience, safety, and other purposes. In *Levin,* however, the Court explicitly acknowledged the possible approval of "proposed streets not already shown on the master plan or official map[,]" 35 *N.J.* at 511, 173 *A.*2d 391, suggesting that the Court did not view an official map as the exclusive plan for future streets.

Furthermore, the Court's comment in a footnote that an official map "conclusively show[s] the location and width of present and proposed streets ..." in *Kligman v. Lautman,* 53 *N.J.* 517, 535 n. 2, 251 *A.*2d 745 (1969), does not remove the possibility of approval of proposed streets that are not on the map. Defendant notes the Court's dicta that an official map "has been described as 'a device for putting some teeth in the otherwise advisory effect of certain physical aspects of a master plan.'" (quoting *Kligman v. Lautman, supra,* 53 *N.J.* at 535 n. 2, 251 *A.*2d 745). Again, however, that commentary reflects the relative importance of the official map vis-a-vis the master plan without requiring that additional and possibly conflicting proposed streets be automatically rejected.

The Appellate Division viewed an official map as "the skeletal framework upon which the community can develop and grow." 237 *N.J.Super.* at 309, 567 *A.*2d 1010. The court recognized that streets not on the official map can be valid, but concluded that "by implication such streets are intended to fill out the skeleton, not conflict with it." *Ibid.* In effect, the court held that an official map does not preclude a planning board from approving additional streets not shown on the map, but rather that a planning board may not approve streets that conflict with the map.

■ Although we do not disagree with the Appellate Division's general statement of a planning board's authority, we disagree with its application of the general rule to this case. We find, as did the trial court, that the testimony adduced before the Planning Board and at trial did not establish any conflict with the "skeleton" of the official map. We also find

that *N.J.S.A.* 40:55D–32 does not prohibit a planning board from approving a subdivision application that proposes an access road not shown on the official map. Here, the official map showed only one access to the entire twenty-seven-acre farm. Only ten acres of that farm were sold, and those ten acres do not abut the proposed street or any other existing street. The purchaser who bought an adjacent lot fronting an existing street is not categorically prohibited by *N.J.S.A.* 40:55D–32 from creating a new access road not shown on the official map to enter his ten acres.

The proposed street and the access road now serve two distinct properties owned by two parties. The proposed street provides access to the Demarest property and the Nigro access road to the Nigro property. To freeze the development of the entire twenty-seven-acre tract on the basis of proposals in the official map would effectively force the Demarests to sell or retain the entire parcel.

■ Planning connotes both flexibility and stability. Under the MLUL, a planning board has the power to exercise control over development of roads proposed in a subdivision. In a case where the location of a proposed road directly conflicts with a critical element of a town's planning, such as a major county thoroughfare, a planning board should consider denying approval of the subdivision. Indeed, an official map deserves the highest degree of deference in such situations.

■ But where there is no direct conflict between the access road and the proposed street, where there is no other access available to the property owner, where the access road arguably reflects planning comparable to that of the proposed street, then the board should work with the owner and suggest modifications to mitigate any perceived problems. The board cannot deny the property owner's subdivision and have the land remain forever landlocked.

In conclusion, we hold that an official map deserves substantial but not absolute deference in planning board decision-making regarding subdivision approvals. Although a clear conflict with a street proposed on a municipality's official map may provide a basis for a planning board to reject a subdivision application, the official map should not be seen as immutable. Certainly, the statutory requirements for adoption and amendment of an official map suggest that streets proposed on an official map should receive substantial consideration. However, to fulfill its duty of "guid[ing] the appropriate use or development of all lands ... in a manner which will promote the public health, safety, morals and general welfare," *N.J.S.A.* 40:55D–2(a), a planning board should not automatically reject applications that do not conform entirely with officially-proposed streets.

We cannot resolve here the factual conflict about whether the access road and the proposed street actually overlap. Hence, we reverse the judgment of the Appellate Division and remand the matter to the Saddle River Planning Board for further proceedings consistent with this opinion.

*For affirmance*—None.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.