619 A.2d 676

PIZZO MANTIN GROUP, PLAINTIFF-APPELLANT, v. TOWNSHIP
OF RANDOLPH AND THE PLANNING BOARD OF THE
TOWNSHIP OF RANDOLPH, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 6, 1993—Decided February 4, 1993.

Before Judges GAULKIN, HAVEY and BROCHIN.

*Douglas R. Henshaw* argued the cause for appellant (*Henshaw & Brady,* attorneys; *Mr. Henshaw* of counsel and on the brief with *Rosella E. Nichay*).

*Edward J. Buzak* argued the cause for respondents (*Mr. Buzak* of counsel and on the brief with *Robert B. Campbell*).

*Hutt & Berkow,* attorneys for *amicus curiae,* New Jersey Builders Association (*Stewart M. Hutt,* of counsel; *Susan R. Kaplan* on the brief).

The opinion of the court was delivered by

HAVEY, J.A.D.

■ Plaintiff Pizzo Mantin Group appeals from a judgment upholding the denial by defendant Planning Board of the Township of Randolph (Board) of plaintiff's preliminary major subdivision application. Relying on *El Shaer v. Planning Bd.*, 249 *N.J.Super.* 323, 592 *A.*2d 565 (App.Div.), *certif. denied,* 127 *N.J.* 546, 606 *A.*2d 360 (1991), the trial court concluded that the Board did not act arbitrarily in denying the application, reasoning that the property was "unsuitable" for development as the proposal was designed. In so finding, the court made no reference to the specific standards of Randolph Township's subdivision ordinance, nor did it decide whether plaintiff had satisfied those standards. We reverse and remand to the Board for further proceedings. We hold that a planning board must review a subdivision application within the framework of, and in accordance with, the standards of a municipality's subdivision and, when applicable, its zoning ordinance. If the application satisfies the standards of the local ordinances and the provisions of the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –129, it should be approved. On remand, the Board should grant or deny plaintiff's proposal based on its application of those standards.

Plaintiff is the owner of a seventy-nine acre tract of land, seventy-two acres of which are in Randolph Township. The remaining seven acres are located in Mendham Township.[1] The site is centered along an 885–foot high ridge. From that central ridge, the property descends to the north into Dawson Brook and to the south into India Brook, both pure water trout-production streams. Currently, the tract is wooded and undeveloped. It contains wetlands along both Dawson and India

---

[1] Plaintiff had initiated annexation proceedings whereby the Township of Randolph would annex the portion of the tract located in Mendham Township. For the purpose of plaintiff's subdivision application, the Board assumed that Randolph would annex the tract and hence, that a part of the tract was located in Mendham had no bearing on the Board's deliberation.

Brooks and various places along its southerly border. The tract borders the intersection of Combs Avenue and Combs Hollow Road, both presently substandard and barely adequate to service existing development within the "Combs Hollow" section of Randolph Township.

Plaintiff applied for preliminary major subdivision approval to subdivide the tract into thirty lots, two of which were to be retained for detention basins. No variances or plan-design waivers were sought. The proposed roadway design included a loop-style roadway running throughout the development, connecting with Combs Avenue at two locations. Traffic using Combs Avenue would be directed into the loop roadway, and that portion of the avenue between the loop-roadway connections would be designated a private road.

After extensive public hearings, plaintiff's application was denied. In the Board's comprehensive resolution, it found that the site "presents a variety of severe environmental constraints which the proposal does not adequately accommodate." First, the Board concluded that a significant portion of the tract contained slopes which exceed twenty-five percent, and that the "interior loop roadway traverses some of the steepest slope areas located upon the site." It also noted that the design would require removal of 36,700 cubic yards of soil from the site, and found that the removal of this quantity of earth would have "significant soil disturbance ramifications, erosion considerations, and would generally effect a significant intrusion into the pre-existing topography and sloped area." It also found that the "wetlands-averaging waiver" plaintiff was seeking from the New Jersey Department of Environmental Protection and Energy would not be adequate to satisfy local environmental concerns. It determined that because of the steep slopes and substantial earth removal, the development "would cause a major environmental impact upon the general area, and particularly upon the two trout streams, Dawson and India Brooks." Finally, the Board found that the proposed loop roadway would result in an "inappropriate traffic flow" and would not promote

the public safety because it would be constructed upon the "most steeply sloped and environmentally sensitive areas of the site."

In upholding the Board's denial, the trial court observed that the loop roadway connecting to Combs Avenue was "a very, very difficult plan in terms of engineering, requiring road construction all around the ridge of the mountains" and resulted in "a gigantic earth movement project." As a further basis for the denial, the court noted the drainage caused by the earth removal from the slope area, which would run off into the two adjoining pure water trout streams. Citing *El Shaer*, 249 *N.J.Super.* at 327–29, 592 *A.*2d 565, which held that a planning board may reject a subdivision plan despite its compliance with the bulk requirements of the zoning ordinance if sound planning considerations justify a denial, the trial court concluded:

> In my view, given the teaching of the *El Shaer* case, given the very serious planning problems from the viewpoint of traffic flow, and more importantly, I think from the viewpoint of major intrusion on the critical slopes, major disturbance and movement of earth both within the tract and off the tract, given the problems posed by that, and given the deference which courts are supposed to pay to decisions made by planning boards, I cannot find that the Planning Board acted unreasonably, arbitrarily, or capriciously in turning down this subdivision in light of the whole road design problem.

## I

Prior to the passage of the MLUL, procedures for the approval of preliminary subdivision plots were governed by the Municipal Planning Act of 1953 (Planning Act), *N.J.S.A.* 40:55–1.1 to – 1.42 (repealed 1975). Approval was granted either by the local planning board alone or by the governing body on favorable referral from the board. *N.J.S.A.* 40:55–1.14 (repealed 1975). Under the Planning Act, requirements for plot approval fell into two distinct categories: mandatory general terms and conditions relating to layout, design and other basic features of the subdivision plot (*N.J.S.A.* 40:55–1.20) (repealed 1975); and permissive requirements respecting the installation of improvements. *N.J.S.A.* 40:55–1.12 (repealed 1975).

The first classification, captioned "Conditions to be required in acting upon plats" vested a planning board with broad discretion to review subdivision plats. *N.J.S.A.* 40:55–1.20 (repealed 1975). For example, it provided that a planning board "shall require, among other conditions in the public interest," that the tract be adequately drained. Regarding roadways, a planning board was authorized to require that the streets be of sufficient width and suitable grade, suitably located to accommodate prospective traffic, and to provide access for emergency vehicles, and to be coordinated with the official map and master plan. *Ibid.* The board was also empowered to "require that all lots shown on the plats shall be adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace." *Ibid.* With reference to *N.J.S.A.* 40:55–1.20, our Supreme Court in *Ardolino v. Florham Park Board of Adjust.,* 24 *N.J.* 94, 110, 130 *A.*2d 847 (1957), stated that "[i]t is the obvious intent of the act that in matters requiring the approval of the planning board it should have the authority to impose those conditions which in the circumstances it believes are reasonably necessary for the protection of the public good and welfare."

These "wide and strong" review powers of the planning board were subject only to the "precise limitations" found in *N.J.S.A.* 40:55–1.15 (repealed 1975), requiring that the ordinance contain standards for the approval of the design of subdivisions and of the streets therein, and compliance with the local zoning ordinance with respect to minimum lot sizes and lot area requirements. *Levin v. Livingston Tp.,* 35 *N.J.* 500, 510, 173 *A.*2d 391 (1961). As Justice Hall stated in *Levin:*

The purposes behind and the scope of the required general terms and conditions [*N.J.S.A.* 40:55–1.20] are equally plain. At inception the planning board must pass upon basic matters of the highest significance to future community growth and well-being and the welfare of individuals who will ultimately become owners and occupants in the subdivision. [I]t is of essential importance to determine whether the whole tract proposed to be subdivided is fundamentally suitable for the projected development from the standpoint of area, topography, drainage, soil characteristics, accessibility, availability of utilities and the like, or, if not, in whole or in part, whether and to what extent

special conditions can be imposed to make it so. It must also decide upon the best layout of lots and streets and whether it conforms to the ordinance design and to the master plan and official map (if the municipality has adopted such). It must consider the impact upon adjacent areas and the effect of other pertinent ordinances of the municipality.

. . . .

In short, at inception the board has the very great responsibility of doing everything possible to avoid future problems of vital importance to the community and subsequent individual property owners.

[*Id.* at 510–11, 173 *A.*2d 391 (citations omitted).]

The *Levin* Court observed that the Livingston ordinance "implements these purposes by specifying standards in detail and prescribing the information which must be furnished on or with the preliminary plat with respect to the layout and characteristics of the entire development." *Id.* at 511, 173 *A.*2d 391. *See also Popular Refreshments, Inc. v. Fuller's Milk Bar & Recreation Ctr., Inc.,* 85 *N.J.Super.* 528, 537, 205 *A.*2d 445 (App.Div.1964), *certif. denied,* 44 *N.J.* 409, 209 *A.*2d 143 (1965) ("If planning boards had no alternative but to rubber-stamp their approval on every subdivision plat which conformed with the zoning ordinance, there would be little or no reason for their existence").

II

The MLUL, which became effective in August 1976, redefined the powers and functions of a planning board in the review of subdivision applications. The MLUL was intended to retain "all of the present powers of municipalities in [the zoning and planning] fields" and to "standardize[ ] the procedures to be employed by the various administrative agencies such as . . . planning boards . . . ." Senate County & Mun.Gov't.Comm., *Statement to Senate Bill No. 3054* 67 (1975) (*Statement*). Similarly, among the common themes advanced throughout the public hearing conducted prior to adoption of the MLUL, were the need to simplify and standardize procedures before the local boards, and also to maintain, if not broaden, the statutory municipal powers of zoning and planning as embodied in pre-MLUL law. *See Public Hearing Before Senate County and*

*Mun. Gov't. Comm. on Senate Bill No. 3054* 1, 4 (Apr. 3, 1975) (*Public Hearing*).

Not unlike the repealed Planning Act (*N.J.S.A.* 40:55–1.15), the MLUL provides that subdivision ordinances shall require design standards. *N.J.S.A.* 40:55D–38 states that the subdivision ordinance shall include standards concerning particular features of the subdivision plan, including provisions ensuring: (1) consistency of the layout or arrangement of the subdivision with the requirements of the zoning ordinance (*N.J.S.A.* 40:55D–38b(1)); (2) streets of sufficient width and suitable grade and suitably located to accommodate prospective traffic and to provide access for emergency vehicles (*N.J.S.A.* 40:55D–38b(2)); (3) coordination of the street design in order to create a convenient system, consistent with the official map and master plan (*ibid.*); and (4) "[a]dequate water supply, drainage, shade trees, sewerage facilities and other utilities necessary for essential services to residents and occupants" (*N.J.S.A.* 40:55D–38b(3)). *N.J.S.A.* 40:55D–38 has no provision, as did the repealed Planning Act, granting a planning board the power to require that lots in the subdivision plan be "adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace." *N.J.S.A.* 40:55–1.20 (repealed 1975). Another distinguishing feature of the MLUL is found in the procedural section, which provides in pertinent part that "[t]he planning board *shall*, if the proposed subdivision complies with the [subdivision] ordinance and this act, grant preliminary approval to the subdivision." *N.J.S.A.* 40:55D–48 (emphasis added).

We agree with plaintiff and *amicus* that these pertinent sections of the MLUL evince a legislative design to require consistency, uniformity and predictability in the subdivision approval process. The legislative scheme clearly suggests that the planning board's review of, and decision respecting, the particular characteristics of the proposal and layout of the entire design must be made in the context of standards encompassed in the subdivision and, if pertinent, the zoning ordi-

nance.[2] The mandate under *N.J.S.A.* 40:55D–48 that upon compliance with the subdivision ordinance and the MLUL, the application "shall" be approved, supports such a conclusion. Without such standards, the applicant cannot estimate the cost of the approval process or predict its ultimate outcome. Further, the absence of standards may invite inconsistency, and lead to arbitrary action by the planning authority. In our view, the pertinent provisions of the MLUL are nothing more than a codification of the principles advanced by *Levin,* that the purposes behind the scope of the required general terms and conditions under the prior act must be implemented by standards with respect to the layout and characteristics of the entire development. 35 *N.J.* at 511, 173 *A.*2d 391.

■ We reject the Board's argument that since *N.J.S.A.* 40:55D–48 provides that a subdivision shall be approved if it complies with the ordinance "and this act," a planning board has the inherent power to deny a proposal if it is inconsistent with the purposes of the MLUL, enumerated in *N.J.S.A.* 40:55D–2. The "purposes" section of the MLUL is intended to provide "a clearer articulation of objectives of the municipal land use law and each of its component subsystems." *Statement, supra,* at 2. It was not a codification of standards for the purpose of guiding planning boards in the review of particular subdivision applications. Rather, it provides a framework, together with *N.J.S.A.* 40:55D–38, from which general guidelines and particular standards should be devised by the governing body. Moreover, the Board's construction of *N.J.S.A.* 40:55D–48 renders superfluous the statute's reference to the subdivision ordinance.

---

[2] It is assumed, of course, that there may be other pertinent governmental regulations that control the use and development of the tract. Thus, under *N.J.S.A.* 40:55D–22b, a planning board "shall, in appropriate circumstances, condition its approval upon the subsequent approval" of other governmental agencies. *See* William M. Cox, *New Jersey Zoning and Land Use Administration* § 16–6, at 261 (11th ed. 1992).

Some confusion concerning the powers of a planning board in reviewing subdivision proposals has been created by *dictum* in our opinion in *El Shaer.* There, we affirmed the denial of a ten-lot subdivision plan where the planning board determined that several of the lots were unsuitable for residential building. *Id.* 249 *N.J.Super.* at 327, 592 *A.*2d 565. In denying the application, the board also cited severe drainage problems and traffic hazards. *Ibid.* We rejected the applicant's argument that it was entitled to a subdivision approval simply because it conformed to the bulk requirements of the zoning ordinance. *Ibid.* Citing *Levin* and *Popular,* we observed that a planning board "may require that all of the lots proposed on the development plat are shown to be adaptable for the intended purposes and without danger to the public welfare." *Id.* at 328, 592 *A.*2d 565.

As stated, *El Shaer* involved compliance with the *bulk* requirements of the *zoning* ordinance. What is implied in *El Shaer,* but not articulated, is that the applicant's design failed to conform with all of the specifications and standards of the *subdivision* ordinance. Hence, *El Shaer* properly concluded that rejection of the subdivision was sustainable because various design features presented dangers to the public welfare. However, by not referring to the pertinent subdivision standards, *El Shaer* implied that a planning board had the inherent power to reject a plan without reference to those standards. The trial court here understandably so interpreted *El Shaer,* and sustained the rejection of plaintiff's application without reference to any of the provisions of the local ordinance. We hold here that no such inherent power exists.

III

The Board argues that requiring it to review subdivision applications within the framework of ordinance standards reduces its power to the ministerial function of check-listing

specific ordinance provisions and "rubber stamping" approval upon compliance. We do not agree.

As stated, the MLUL was intended not only to streamline and standardize procedures, but also to preserve the substantive law concerning the functions and powers of the local planning authorities that existed under pre-MLUL law. *See Statement, supra,* at 1–2; *Public Hearing, supra,* at 26. Even since the passage of the MLUL, our courts have recognized the wide discretion accorded municipalities to adopt measures reasonably designed to advance the purposes of zoning and sound planning in the exercise of their land-use functions. *Urban v. Planning Bd.,* 124 *N.J.* 651, 662, 592 *A.*2d 240 (1991). We must be mindful that the fundamental goal of municipal planning is to promote the general welfare. *Nigro v. Planning Bd.,* 122 *N.J.* 270, 284, 584 *A.*2d 1350 (1991). Consequently, "[p]lanning connotes both flexibility and stability." *Id.* at 286, 584 *A.*2d 1350.

■ Hence, while subdivision ordinances must be reasonably specific in order to provide guidance and to foster consistency and fairness in their application, we have no doubt that they may be sufficiently flexible to allow the board broad discretion in protecting the public welfare. *Levin,* 35 *N.J.* at 511, 173 *A.*2d 391. The provisions should also be liberally construed to permit the board to exercise its duties in a rational basis, in accordance with sound planning principles. *See N.J. Const.* art. IV, § 7, ¶ 11.

For example, the Model Subdivision and Site Plan Ordinance prepared by the Center for Urban Policy Research, enumerates suggested "design guidelines" relating to the layout of buildings and roads, preservation of natural resources and features of the site, and protection of land "unsuitable for development." David Listokin & Carole W. Baker, *Model Subdivision and Site*

*Plan Ordinance* 161–245 (1987).[3] These "guidelines" are intended to "lay out a systematic approach to designing new developments in order to provide a framework for sound planning." *Id.* at 163. They are to be contrasted with engineering standards contained in the subdivision ordinance, those precisely enumerated requirements "the development must meet or the methods of construction that must be adhered to." *Ibid.* Of course, the guidelines must bear a reasonable relationship to the purposes of the MLUL, relate to sound planning objectives and, as noted, be specific enough to pass a challenge based on a claim of vagueness or arbitrariness.

 Further, we reject the argument advanced by *amicus* that the "total suitability" of the proposed site is no longer a factor for planning board consideration under the MLUL. Although *N.J.S.A.* 40:55D–38 enumerates specific provisions which must be included in subdivision ordinances, we do not read the section as intending to preclude the adoption of standards not expressly enumerated, including standards that concern the suitability of a proposed lot or lots because of topographical or other physical characteristics of the site, or that intend to preserve the site's natural features. We must presume that the Legislature intended to preserve the teachings of *Levin*, that "it is of essential importance to determine whether the whole tract ... is fundamentally suitable for the projected development...." 35 *N.J.* at 510, 173 *A.*2d 391. *See New Jersey Bldrs. Ass'n v. Bernards Tp.*, 108 *N.J.* 223, 236, 528 *A.*2d 555 (1987) ("when the Legislature enacted the MLUL in

---

[3] On January 29, 1993, Governor Florio signed into law the "Site Improvement Standards Act," *L.*1993, *c.* 32, which directs the Site Improvements Advisory Board to adopt uniform design standards concerning "streets, off-street parking, water supply, sanitary sewers and storm water management" in accordance with the Model Subdivision and Site Plan Ordinance. *Id.* § 4a. If adopted by the Commissioner of Community Affairs, these design standards shall supersede any site improvement standards contained within a municipality's development ordinance. *Id.* § 5. Notably, nothing in this law limits a municipality's zoning power. *Id.* § 6.

1976, it is presumed to have had knowledge of the relevant judicial decisions"). It is fundamental, however, that a board's findings concerning the "suitability" or "unsuitability" of the proposed lots, or even of the design as a whole, must be made by reference to the ordinance standards, and will not survive a challenge if arbitrary, capricious or unreasonable. *Kramer v. Board of Adjust.*, 45 *N.J.* 268, 285, 212 *A.*2d 153 (1965). Further, as our Supreme Court has consistently emphasized, "planning, and not *ad hoc* decision-making, is the cornerstone of sound governmental policy in this area." *Kaufmann v. Planning Bd.*, 110 *N.J.* 551, 557, 542 *A.*2d 457 (1988); *see also Riggs v. Township of Long Beach*, 109 *N.J.* 601, 619–22, 538 *A.*2d 808 (1988) (Handler, J., concurring). Hence, the board's fact finding must be articulated for the purpose of judicial scrutiny, if necessary, *Urban*, 124 *N.J.* at 662, 592 *A.*2d 240, and must be well-grounded on the evidence adduced during the board hearings. *Kramer*, 45 *N.J.* at 284–85, 212 *A.*2d 153.

For the reasons expressed above, we conclude that a remand to the Board is necessary for a review of plaintiff's application and new findings by reference to the specific provisions of the subdivision ordinance and, if applicable, the zoning ordinance. Randolph Township's subdivision ordinance has several pertinent provisions. Section 15–26(a), entitled "suitability" of lots, provides that the board may withhold approval of lots where there is a question as to their suitability for their intended use due to factors such as rock formation, the presence of steep slopes, flood conditions, "or similar circumstances." The section incorporates by reference the township's steep slope ordinance regulations, contained in the zoning ordinance, which concerns itself with lots having slopes in excess of fifteen percent which "invariably involve severe limitations to development, including ... building and road construction and septic effluent disposal," as well as the potential for disturbance of soil, surface water runoff, soil erosion, pollution of streams and the danger of flooding and water drainage. *Township of Randolph Zoning Ordinance* § 33–38.1. Section 15–31 of the

subdivision ordinance provides that "natural features such as trees, brooks, hilltops and views shall be preserved whenever possible in designing any subdivision containing such features." [4] Section 15–27 controls flood prone or other "unsuitable lands." There are other specific provisions concerning drainage, the layout and minimum requirements of streets, soil erosion control and grading, all of which may be pertinent to the review of plaintiff's application. Accordingly, the Board shall reconsider plaintiff's application in accordance with the applicable standards of the subdivision ordinance. Upon making its determination, the Board shall articulate its findings of facts and conclusions of law.

Reversed and remanded to the Board for further proceedings. We do not retain jurisdiction.

---

[4] There has been no challenge to any of the provisions of the Randolph Township subdivision ordinance based on a claim of vagueness.