639 A.2d 1161

ALVIN GOLDSTEIN AND ELEANOR GOLDSTEIN, HUSBAND AND WIFE, PLAINTIFFS, v. PLANNING BOARD OF THE BOROUGH OF BARNEGAT LIGHT AND THE BOROUGH OF BARNEGAT LIGHT, A MUNICIPAL CORPORATION, DEFENDANTS.

PLANNING BOARD OF THE BOROUGH OF BARNEGAT LIGHT, DEFENDANT/THIRD–PARTY PLAINTIFF, v. STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION AND ENERGY, THIRD–PARTY DEFENDANT.

Superior Court of New Jersey
Law Division Ocean County

Decided December 17, 1993.

360

*Stephen Hankin* for plaintiffs (*Hankin, Sandson & Sandman,* attorneys).

*Charles W. Hutchinson, Jr.,* for defendant Borough of Barnegat Light (*Gilmore & Monahan,* P.A., attorneys).

*Russell P. Cherkos* for defendant/third-party plaintiff Planning Board of the Borough of Barnegat Light.

*Lewin J. Weyl,* Deputy Attorney General, for third-party defendant State of New Jersey, Department of Environmental Protection and Energy (*Fred DeVesa,* acting Attorney General).

SERPENTELLI, A.J.S.C.

This opinion addresses three issues arising out of the Appellate Division companion cases of *El Shaer v. Planning Board of Lawrence,* 249 *N.J.Super.* 323, 592 *A.*2d 565 (App.Div.), *certif. denied,* 127 *N.J.* 546, 606 *A.*2d 360 (1991), and *Pizzo Mantin Group v. Randolph Tp.,* 261 *N.J.Super.* 659, 619 *A.*2d 676 (App. Div.) *certif. granted,* 134 *N.J.* 476, 634 *A.*2d 524 (1993). First, must a planning board's review of a subdivision application be restricted to the standards of a municipality's subdivision and zoning ordinance? If not, what other municipal regulations may a planning board consider? Lastly, to what extent is the board's discretion limited in cases involving the mere consolidation of pre-existing, conforming lots?

Plaintiffs own property which consists of three lots designated as lots 16, 18 and 20 as shown on the tax map of the Borough of Barnegat Light. All three are contiguous and abut Sixth Street which runs from its westerly intersection with Central Avenue to its easterly terminus at the Atlantic Ocean beach front. Lot 20 is adjacent to the beach front, lot 18 is to the west of lot 20 and lot 16 is to the west of lot 18. A home is situated principally on lot 16 although a portion of a deck and wooden walkway are located within lot 18. A free standing deck is located principally on lot 18, with a portion of it extending onto lot 20.

The property is in a R–B zone which permits single family detached dwellings on lots containing a minimum of 5,000 square feet and a minimum frontage of 50 feet. Each of the lots conforms to all bulk requirements of the zoning ordinance.

The plaintiffs purchased the premises on June 7, 1976. At the time of acquisition, the plaintiffs obtained a letter from the borough clerk certifying that the two vacant lots, 18 and 20, were "buildable lots at this time" and that "a building permit can be issued immediately subject to the building line established by the Borough Engineer and providing that all requirements of the Codified Ordinances of the Borough are complied with."

After the plaintiffs purchased the premises, the Borough of Barnegat Light enacted an ordinance referred to in these proceedings as Chapter XI of the Code of the Borough of Barnegat Light (hereinafter Chapter XI). This ordinance is independent of the subdivision and zoning regulations contained elsewhere in the Code. Chapter XI restricts construction in "beach-dune" areas. Lots 18 and 20 fall within the boundaries of that area.

On September 29, 1987, the Borough entered into a contract with the New Jersey Department of Environmental Protection and Energy (hereinafter DEPE), by which the Borough agreed that, in consideration of the DEPE approving the pass through of certain federal funds to the Borough for beach-dune restoration, the Borough would amend Chapter XI. In essence, the amended Chapter prohibits disturbance of beach-dune areas except for specified purposes and even then only subject to severe restrictions on permitted uses. The effect of Chapter XI is to prohibit totally the construction of any residence within a beach-dune area.

In August 1992, the plaintiffs applied to the Planning Board for preliminary and final subdivision approval. The plaintiffs sought to resubdivide three lots into two lots designated as 16.01 and 18.01. Each new lot would then be 75 feet wide and 125 feet deep. The existing home would remain on Lot 16.01. A hearing was held on the application on August 25, 1992, at the conclusion of which the Board denied the application.

A memorializing resolution was adopted on September 29, 1992, on which date the Board also entertained an application for reconsideration of its decision. At the conclusion of that hearing, the Board again denied the application. A second memorializing

resolution was thereafter adopted on October 27, 1992. An appeal to this court followed.

The Planning Board's resolutions reveal that the principal reason for denial of the subdivision application is the impact of Chapter XI on beach-dune construction. In fact, the dune restrictions of Chapter XI were the subject of most of the debate before the Planning Board at both hearings. Essentially, the Board members recognized that the plaintiffs' proposal conformed to all bulk requirements of the zoning ordinance. They also acknowledged that lot 20 was a conforming vacant lot, whether or not the subdivision was granted. Additionally, with the removal of the deck and walkway encroaching on lot 18, the plaintiffs would have two conforming vacant lots. Some Board members feared that approval of the proposed lot consolidation would violate Chapter XI and the DEPE agreement and that, as a result, the DEPE would void its agreement with the Borough. In part, these members relied upon an April 8, 1992 letter from the DEPE to Alvin Goldstein which concluded that the entire area of the proposed lot would be considered dunes and that "the proposed subdivision and construction on this property would be considered a violation of the Agreement."

In response, Goldstein argued that the Board should not concern itself with Chapter XI or the agreement. He readily conceded that the application for a subdivision was only a first step in the process of ultimately obtaining approval to build on the vacant lot. He stressed that he was not seeking a variance or other relief from the terms of Chapter XI. Indeed, he agreed that the Board could grant the application conditioned on such other governmental approvals as might be required, including relief from the terms of Chapter XI.

The reasons for the Board's denial of the application at the first hearing are contained within paragraphs 8, 9 and 11 of the resolution.

(8) The proposed subdivision does not comply with the provisions of the Borough Ordinances and does adversely affect the public health and welfare;

(9) The Boards [sic] specifically notes that these premises are located on the Beach—Dune areas and as such are affected by Ordinance Chapter XI Waterfront and Waterways, Sections 11–1 *Delineation of Beach and Dune Area/State Aid Agreement Number 1512*, of which, this Board is unable to grant relief;

(11) In addition, the Board notes that the NJDEPE has determined that the proposed subdivision and construction on this property would be in violation of the Borough Ordinance and the State Aid Agreement and, therefore, if the Board grants this application, it would be creating a non-buildable lot which would give rise to poor municipal planning.

The resolution adopted as a result of the reconsideration hearing of September 29, 1992, relies upon the three reasons set forth above and adds, in new paragraph 8, the following:

(8) The Board notes that the three [3] tax lots have been utilized as one homestead for numerous years and cannot now be subdivided without Planning Board approval since the lots have merged and are to be treated as one [1] lot.

With regard to this last reason, the issue of merger is not pursued in the defendants' briefs. Furthermore, it is clear that *N.J.S.A.* 40:55D–7, in its definition of the term subdivision, exempts the three lots here involved since they are conforming lots which meet all bulk requirements and abut a street. They can be separately conveyed. The existing encroachments would not limit that right. Even assuming the lots had merged, the plaintiff had a right to subdivide them into conforming parcels absent some other legal impediment.

Additionally, to the extent that the Board found the subdivision would "adversely affect the public health and welfare" and that the creation of the lot would "give rise to poor municipal planning," the court could not sustain a denial on either of those grounds since they are totally conclusory and without basis in the record. *Harrington Glen v. Board of Adjustment of the Borough of Leonia*, 52 *N.J.* 22, 27–28, 243 *A.2d* 233 (1968).

The crux of the case is the Board's finding that approval of the subdivision would violate Chapter XI and void the Borough's agreement with DEPE. While the Board's resolutions express concern about "creating a non-buildable lot," the transcript of both hearings demonstrates that the Board members were fearful that by approving the subdivision they would somehow be making the

new lot "buildable," or at least more buildable than it was before the subdivision. For example, at the August 25, 1992 meeting the following exchange occurred between the Board attorney, Carol Sicheri, and Board member, Peter Doorly:

Ms. Sicheri: Well, the reason why he has to do that, though, he has to go through all those hurdles, and if he gets a yes on everyone of those hurdles—and there are many that he'll have to pass—then he will have a buildable lot. This is only the first step [referring to approval of the subdivision].

Mr. Doorly: Yes, but we're—aren't we, by giving him the subdivision, imposing our—the Planning Board's feeling that this can be a buildable lot? And as it stands now it cannot be a buildable lot. That's—isn't that our provision? [sic—presumably "position"]

Another Board member, however, argued that approval of the subdivision would do nothing to make the lot more buildable. Thus, member Frederick Gibbs said:

Mr. Gibbs: But I still come back, though, Mr. Goldstein could sell one of those lots or that eastern most lot today just as well, the fifty foot lot—just as well as he could sell one—you know, it probably wouldn't be worth as much but just as well as he could sell a seventy-five foot lot. I mean we're not doing anything to, as Peters says, to make it buildable by doing this or are we?

The Board attorney responded:

Ms. Sicheri: I think that the board should really focus on the application itself here, and all—it really is a very simple application in the sense that all he's asking is just to make this tract into two large lots. . . .

As it relates to Chapter XI, the pretrial memorandum framed the issue as whether the Board wrongfully relied upon Section 11–1.3(c)(6) and the Borough's agreement with the DEPE to conclude that the Board was without jurisdiction to grant relief. Apparently, the Board was prepared to argue that only the governing body of Barnegat Light could give the plaintiffs relief from the terms of Chapter XI. However, the Board's counsel in his brief candidly, and in the court's view correctly, concedes that the cited section does not permit any agency to authorize construction of a dwelling in the beach-dune area. Instead, for the first time on appeal, the Board's counsel relies heavily upon the provisions of Section 13–7.4(e) of the Land Subdivision Ordinance which, he asserts, allows the Board to incorporate the provisions of Chapter XI into the

decision making process and empowers it to deny the application based on the terms of Chapter XI.

Section 13–7.4(e) provides:

Where there is a question as to the suitability of a lot for their [sic] intended use due to factors such as rock formations, flood conditions or similar circumstances, the planning board may, after adequate investigation withhold approval of such lots.

The Board and the DEPE contend that the quoted language gave the Board the right to employ the restrictive provisions of Chapter XI to deny the subdivision because the proposed lot could not be suitable for the construction of a residence. To support their position, they rely primarily upon the decisions of the Appellate Division in *El Shaer v. Planning Board of Lawrence*, *supra*, 249 *N.J.Super.* at 323, 592 *A.2d* 565 and *Pizzo Mantin Group v. Randolph Tp.*, *supra*, 261 *N.J.Super.* at 659, 619 *A.2d* 676.

In *El Shaer*, the plaintiff proposed to subdivide a 10.22–acre tract into ten residential lots. Substantial portions of the property fell within a proposed conservation easement and were affected by flood hazard plains of an adjacent creek. The Board determined that the creek was prone to flooding which could potentially result in appreciable harmful effects to the environment. The Board concluded that two lots were significantly affected by the flood plain and were not suitable for development because they had no usable yard area. Finding that the plaintiff had failed to provide alternative plans which would have a less negative environmental impact, the Board rejected the application. The trial court endorsed the Board's finding. The Appellate Division affirmed. In so doing, it concluded in part:

That plaintiff may have met the specific bulk requirements of the development ordinance does not mean that he was entitled to an approval of his subdivision plan. A planning board 'is not obligated to approve a subdivision merely because it does not violate any express provision of the zoning ordinance.' [citation omitted] It may require that all of the lots proposed on the development plat are shown to be adaptable for the intended purposes and without danger to the general welfare. [*Id.*, at 327–28, 592 *A.2d* 565 (citation omitted).]

In *Pizzo*, plaintiff appealed from a judgment of the trial court upholding the Planning Board's denial of an application to subdivide a seventy-nine acre tract into thirty lots. The tract contained wetlands and presented a variety of other environmental issues including steep slopes, significant soil disturbance, inappropriate traffic flow and alleged major environmental impacts on the general area, particularly to an adjacent stream.

The trial court in *Pizzo* relied upon *El Shaer* in concluding that the Board did not act arbitrarily in denying the application, reasoning that the property was "unsuitable" for development as designed. Judge Havey, who authored both *El Shaer* and *Pizzo*, took the opportunity to clarify the holding in *El Shaer* and explained its application to the *Pizzo* case. He said:

> As stated, *El Shaer* involved compliance with the *bulk* requirements of the *zoning* ordinance. What is implied in *El Shaer*, but not articulated, is that the applicant's design failed to conform with all of the specifications and standards of the *subdivision* ordinance. Hence, *El Shaer* properly concluded that rejection of the subdivision was sustainable because various design features presented dangers to the public welfare. However, by not referring to the pertinent subdivision standards, *El Shaer* implied that a planning board had the inherent power to reject a plan without reference to those standards. The trial court here understandably so interpreted *El Shaer*, and sustained the rejection of the plaintiff's application without reference to any of the provisions of the local ordinance. We hold here that no such inherent power exists. [*Id.* at 668, 619 A.2d 676.]

Instead, *Pizzo* stresses that the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 to –129 (hereinafter MLUL), evidences a legislative design to require consistency, uniformity and predictability in the subdivision approval process. The legislative scheme suggests that a planning board's review and decision "must be made in the context of standards encompassed in the subdivision ordinance and, if pertinent, in the zoning ordinance." *Id.* at 666–67, 619 A.2d 676. Judge Havey found:

> The mandate under *N.J.S.A.* 40:55D–48 that upon compliance with the subdivision ordinance and the MLUL, the application "shall" be approved, supports such a conclusion. Without such standards, the applicant cannot estimate the cost of the approval process or predict its ultimate outcome. Further, the absence of standards may invite inconsistency, and lead to arbitrary action by the planning

authority. In our view, the pertinent provisions of the MLUL are nothing more than a codification of the principles advanced by *Levin* referring to *Levin v. Livingston Tp.*, 35 *N.J.* 500, 173 A.2d 391 (1961), that the purposes behind the scope of the required general terms and conditions under the prior act must be implemented by standards with respect to the layout and characteristics of the entire development. [*Id.* at 667, 619 A.2d 676 (citations omitted).]

The Board's counsel now presses the applicability of Section 13–7.4(e) of the subdivision ordinance in an apparent effort to implicate the mandates of the *Pizzo* case. Even assuming *El Shaer* and *Pizzo* are applicable to the case at bar, the defendants have to overcome several barriers to sustain the denial of the plaintiffs' application. As noted, defendants argue that Section 13–7.4(e) creates a suitability standard pursuant to which the Board could utilize Chapter XI to deny the application. Some of the language of Section 13–7.4(e) is essentially identical to the language contained in the Randolph Township ordinance involved in *Pizzo*. Both ordinances provide that the Board may withhold approval of lots where there is a question as to their suitability for the intended use due to such factors as rock formation, the presence of steep slopes, flood conditions or similar circumstances. However, that is where the Barnegat Light Township ordinance stops.

The Randolph Township subdivision ordinance went much further. It incorporated by reference the township's steep slope regulations, contained in the zoning ordinance, which had detailed provisions relating to construction in such an environment. In addition, the Randolph Township subdivision ordinance had standards regarding preservation of natural features such as trees, brooks, hilltops and views, and regulations concerning the control of flood-prone or other unsuitable lands. Furthermore, the subdivision ordinance contained restrictions pertaining to drainage, the layout and minimum requirement of streets, and soil erosion and grading, all of which the Appellate Division found might be pertinent to a review of the plaintiff's application. Under those circumstances, the court in *Pizzo* concluded that it would be appropriate to remand to the Planning Board for specific factual

findings as to whether the proposed subdivision was suitable within the framework of those standards.

The Barnegat Light Planning Board's utilization of Chapter XI as a basis for its denial of the subdivision applications raises several questions. First, can Chapter XI be considered a subdivision or zoning ordinance even though it is not encompassed within those chapters of the Barnegat Light Code? It is to be recognized that Judge Havey, in *Pizzo,* emphasized that "the particular characteristics of the proposal and the layout of the entire design must be made in the context of standards encompassed in the *subdivision* and, if pertinent, the *zoning ordinance." Id.* at 666–67, 619 *A.2d 676* (emphasis added).

*N.J.S.A.* 40:55D–38 details the mandatory contents of subdivision or site plan ordinances. *N.J.S.A.* 40:55D–40 allows for discretionary contents of subdivision ordinances. Several provisions within these sections would have justified the inclusion of the dune ordinance in the subdivision ordinance. For example, *N.J.S.A.* 40:55D–38(b)(6) allows for the "regulation of land designated as subject to flooding, . . . to avoid danger to life or property." *N.J.S.A.* 40:55D–38(b)(7) authorizes restrictions for "protection and conservation of soil from erosion by wind or water or from excavation or grading." *N.J.S.A.* 40:55D–40(b) allows for the establishment of standards "encouraging and promoting flexibility, economy and environmental soundness in layout and design. . . ." With regard to the zoning ordinance, pursuant to *N.J.S.A.* 40:55D–65(e), the municipality is authorized to "designate and regulate areas subject to flooding. . . ."

■ Thus, it appears that Barnegat Light could have incorporated within its subdivision or zoning ordinance the dune restrictions presently contained within Chapter XI. The fact is, however, that it did not do so.

■ That leads to a second question, namely, whether the Planning Board can go outside of its subdivision and zoning ordinance to find standards relating to suitability in its analysis of

the subdivision application. If the opinion in *Pizzo* is to be read literally, the language quoted above concerning evaluation within the context of a subdivision and zoning ordinance seems to preclude consideration of any other ordinance. However, a review of the MLUL demonstrates that the Legislature has authorized the Planning Board to apply not only subdivision and zoning ordinances in its assessment of applications, but also to consider other "municipal development regulations." For example, *N.J.S.A.* 40:55D-7 in defining the term subdivision and detailing those applications exempt from subdivision process, contains the following exemption in subsection 5:

> [T]he conveyance of one or more adjoining lots, tracts or parcels of land, owned by the same person or persons and all of which are found and certified by the administrative officer to conform to the requirements of the *municipal development regulations* and are shown and designated as separate lots, tracts or parcels on the tax map or atlas of the municipality. (emphasis added)

The term "development regulation" is defined in *N.J.S.A.* 40:55D-4 as follows:

> "Development regulation" means a zoning ordinance, subdivision ordinance, site plan ordinance, official map ordinance or other municipal regulation of the use and development of land, or amendment thereto adopted and filed pursuant to this act.

The breadth of that definition suggests that an ordinance seeking to regulate construction within a beach-dune area is a "municipal regulation of the use and development of land." It is to be noted that the term "municipal development regulation" is contained elsewhere in the MLUL. *N.J.S.A.* 40:55D-40 uses that phrase with regard to the discretionary contents of the subdivision ordinance.

■ It is well established that legislation granting authority to municipalities should be liberally construed in favor of the exercise of that authority. The MLUL invests municipalities with the power to enact subdivision and zoning ordinances for the purpose of protecting the public interest. *Divan Builders v. Wayne Tp. Planning Board,* 66 *N.J.* 582, 595–97, 334 *A.2d* 30 (1975). This goal is promoted by allowing a planning board to apply all regulations within its municipality reasonably related to the use and development of land, whether or not they are actually

contained within the subdivision or zoning ordinance. Clearly, this does not vest the planning board with unbridled authority to use any regulation it deems applicable. However, if the ordinance falls within the definition of "development regulation" as contained within *N.J.S.A.* 40:55D–4, it fulfills the goals of the MLUL to permit the restrictions to be considered in the evaluation process.

But even if the Barnegat Light Planning Board had the right to consider an ordinance outside of its subdivision and zoning ordinances, the court must still determine a third issue. Can the provisions of Chapter XI be relied upon to sustain the denial of the plaintiffs' application? *El Shaer* and *Pizzo* involved applications to subdivide tracts of undeveloped land into individual building lots. The subdivision review naturally implicated issues of suitability to ensure that the individual lots would be adaptable to their intended use and would not endanger the public welfare. The Boards were faced with evident development constraints such as steep slopes, flooding, drainage and traffic. They had to be sure that their actions obviated the evils which could be encountered by approvals that considered only technical compliance with bulk area requirements.

Here, no such considerations are present. As noted earlier, the three existing lots already meet the bulk requirements of the zoning ordinance. As it relates to the right to a subdivision, the dune restrictions change nothing. The plaintiffs' resubdivision merely rearranges existing lot lines of three lots meeting all bulk requirements to reduce the three to two larger lots also meeting all bulk requirements. The dune ordinance is in no way affected for, assuming that it can be used to prevent the plaintiffs from obtaining building permits for the two most easterly lots, it can still preclude the issuance of a permit for the newly created lot. That question, as the plaintiffs correctly argue, is left unresolved whether or not the subdivision is granted.

*El Shaer* and *Pizzo* provide the Planning Board with the discretion, through the use of adequate standards, to prevent the creation of lots which will endanger the public welfare. Chapter

XI, in the context of the resubdivision before this court, has no application to the public welfare issue. Assuming that regulation is valid, it will preclude development on plaintiffs' property whether they continue to own two vacant fifty-foot lots or one vacant seventy-five-foot lot. In short, the concerns regarding the public welfare are not changed by approval. Indeed, if the plaintiffs could successfully challenge the validity of Chapter XI, the Township may then be compelled to grant building permits for two homes in the dune area whereas after subdivision only one home could be built. The public health and welfare could be arguably more endangered by that result.

In light of the result, the court need not address numerous other issues raised by the plaintiffs including the alleged inadequacy of the standards contained in Section 13–7.4(e), the absence of any right to be heard concerning relief from the provisions of Chapter XI, the assertion that Chapter XI improperly usurps the power of the Planning Board and the purported violation of *N.J.S.A.* 40:55D–62 resulting from the failure to refer Chapter XI to the Planning Board for its review before enactment by the governing body.

The court holds that the Board's effort to impose a suitability standard by applying Chapter XI to the subdivision application was arbitrary and capricious. Therefore, the denial of the application is reversed. It is to be emphasized that in so doing, the court does not pass upon the plaintiffs' right to a building permit nor does it adjudicate the allegation that Chapter XI constitutes a taking of plaintiffs' property. Those issues will not ripen until such time as the plaintiffs actually make application for a building permit and have been denied.